## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
## HARRISBURG DIVISION

SMART COMMUNICATIONS
HOLDING, INC. and HLFIP HOLDING,
INC. d/b/a SMART
COMMUNICATIONS IP HOLDINGS,

        *Plaintiffs*,

    v.

GLOBAL TEL*LINK CORP.; YORK
COUNTY, PENNSYLVANIA;
YORK COUNTY PRISON; and ADAM
OGLE, *in his official capacity as York
County Prison Warden*,

        *Defendants*.

CIVIL ACTION
NO._____

**JURY TRIAL DEMANDED**

## COMPLAINT

    Plaintiffs Smart Communications Holding, Inc. and HLFIP Holding, Inc.,
d/b/a Smart Communications IP Holdings (collectively "Smart Communications" or
"Plaintiff") bring this action against Defendants Global Tel*Link Corp. ("GTL");
York County, Pennsylvania ("York County"); York County Prison ("YCP"), and
Mr. Adam Ogle, in his official capacity as acting YCP Warden (York County, YCP,
and Mr. Ogle are collectively referred to as the "York Defendants", and together
with GTL, the "Defendants") to prevent and remedy, *inter alia*, violations of Section

1 of the Sherman Act, 15 U.S.C. § 1 and other anti-competitive actions, and in support, alleges as follows:

## I.  NATURE OF THIS ACTION

1.     Smart Communications brings the present complaint against Defendants for redress from predatory practices that culminated in a contract that violates federal antitrust laws and that constitutes tortious activity pursuant to Pennsylvania common law. As a result of the practices detailed herein, Defendants have precluded Smart Communications from entering the York County Prison market, ensured windfall profits for GTL and harmed their ultimate consumers—prisoners and their loved ones.

## II.  PARTIES

### A.  Plaintiffs

2.     Smart Communications Holding, Inc. is a Florida corporation having a principal place of business at 10491 72nd Street, Seminole, FL 33777.

3.     HLFIP Holding, Inc., d/b/a Smart Communications IP Holdings ("HLFIP") is a Florida corporation having a principal place of business at 10491 72nd Street, Seminole, FL 33777.

### B.  Defendants

4.     Defendant GTL is an Idaho corporation with its principal place of business at 3120 Fairview Park Dr, Falls Church, VA 22042.

5.     Defendant York County, of the Commonwealth of Pennsylvania, is a governmental entity organized under its ordinances, resolutions, policies, regulations, and bylaws, and managed by the York County commissioners and administrators, with offices at York County Administrative Center, 28 East Market Street, York, PA 17401. Upon information and belief, at all times relevant herein, York County is a financially independent entity and participated in, implemented, supervised, approved, and/or ratified the illegal acts described herein. The actions of York County challenged in this Complaint were not undertaken pursuant to a clearly articulated and affirmatively expressed state policy.

6.     Defendant YCP is an adult correctional facility, managed and funded by York County via the county commissioners and administrators and the York County Prison Board. It is located at 3400 Concord Road, York, PA 17402. YCP can be served via its Warden Adam Ogle at the foregoing address. Upon information and belief, at all times relevant herein, YCP participated in, implemented, supervised, approved, and/or ratified the ongoing illegal acts described herein.

7.     YCP is not operated by the Pennsylvania Department of Corrections. *See* www.cor.pa.gov/Facilities/CountyPrisons/Pages/County-Prison-Contact-info .aspx  (last visited October 4, 2021) ("The Pennsylvania Department of Corrections is not responsible for the operation of county prisons.").

8.     Defendant Adam Ogle is the Warden of YCP and is involved in his

3

official capacity in the actions set forth below which constitute anticompetitive behavior. One of Mr. Ogle's official duties as Warden is to oversee operations at the YCP, including the selection, implementation, and use of certain technology and systems within the facility, including inmate calling systems used by prisoners and their families, friends, and lawyers. Upon information and belief, at all times relevant herein, Mr. Ogle participates in, implements, supervises, approves, and/or ratifies the ongoing illegal acts described herein. Mr. Ogle's business address is 3400 Concord Road, York, PA 17402. According to 61 Pa. Cons. Stat. § 1726, "[t]he warden shall submit an annual written report to the board which shall contain information on the population, conditions and practices in the prison and other matters as specified by the board."

9.      Defendants York County and YCP are named not only under a theory of direct liability, but also under a theory of respondeat superior for the actions undertaken by their agents, servants, and employees, who upon information and belief were acting within the scope of their employment at all relevant times.

III.   **JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1337. This Court has supplemental jurisdiction pursuant to 28 U.S.C § 1367 over Plaintiff's state law claims because they are so related to the federal claims that they form part of the same case or controversy.

11.    This Court has personal jurisdiction over Defendant GTL, and venue is proper in this District under 15 U.S.C. § 22, because Defendant GTL transacts substantial business in this District.

12.    This Court has personal jurisdiction over Defendant York County because it is a governmental entity organized under the laws of the Commonwealth of Pennsylvania and situated in this judicial district.

13.    This Court has personal jurisdiction over Defendant YCP because it is located in Pennsylvania, in this judicial district, and is operated by Defendant York County, which is a governmental entity organized under the laws of the Commonwealth of Pennsylvania.

14.    This Court has personal jurisdiction over Defendant Ogle because he is a resident of Pennsylvania and is employed by Defendant York County within this judicial district.

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in—and the Defendants reside in—this district.

## IV.    **TRADE AND COMMERCE**

16.    For YCP inmates to place a phone call to family, friends, lawyers, or others, they must use a special inmate calling service ("ICS"). YCP inmates and their call recipients cannot choose which ICS provider or the per-minute/per-call rates

that they will pay to make a call because York County contracted with GTL for GTL to exclusively provide ICS systems at YCP and to charge YCP inmates at GTL's fixed rates.

17.    Defendants' activities are within the flow of interstate commerce of the United States and are intended to, and did, have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States. Defendants' activities resulted in a contract for the provision of, and the actual provision of, ICS that affected and continue to affect interstate commerce. The activities resulted in and continue to impact the families, friends, and lawyers of YCP inmates who must spend money to pay for collect telephone calls—both intrastate and interstate— initiated by YCP inmates.

## V.    **INDUSTRY BACKGROUND**

18.    Correctional facilities in the United States have traditionally restricted the ability of inmates to communicate with people outside prison/jail. For instance, prison authorities restrict incoming and outgoing inmate postal mail. In addition, prison authorities restrict inmate telephone communications.

19.    YCP is no exception. Unlike citizens outside of prison who may select from a range of providers for telephone service, YCP inmates are restricted to one telecommunications provider.

20.     According to the York County website, at YCP "[a] telephone is located in each housing unit for inmate use. All calls are subject to monitoring, recording, and divulging information. Phone calls are a privilege and can be taken away by a Supervisor. All calls made by the inmates are collect calls. There is an automatic twenty (20) minute time limit on all calls. Inmates are permitted a reasonable amount of outgoing phone calls per day, as long as use of the telephone is not being abused or dominated by any [inmate] or group." *See* https://yorkcountypa.gov/courts-criminal-justice/prison/inmate-rules-and-policies/telephone-system.html.     (last visited October 4, 2021)

21.     In addition, according to the York County website, a family member or other person outside of YCP who wishes to accept a collect call from an inmate must have an account set up with GTL for payment purposes.

## VI.   RESTRAINTS ON COMPETITION

### A.     Exclusive Dealing—The Inmate Calling Program Agreement

22.     On or about November 17, 2003, Defendant York County and TCG Public Communications, Inc., a wholly owned subsidiary of AT&T Corporation (jointly, "AT&T"), entered into an exclusive dealing "Inmate Calling Program Agreement" for the provision of ICS (hereinafter, "ICP Agreement"). GTL later became an assignee and successor-in-interest to the ICP Agreement.

**B.      Continued Exclusive Dealing—The ICP Agreement Amendments**

23.     On or about May 13, 2009, the ICP Agreement was amended in a "First Amendment to Inmate Calling Program" (hereinafter "ICP Amend. #1"). On information and belief, York County did not conduct a competitive procurement that solicited proposals from other potential telecommunications providers before entering into ICP Amend. #1. This amendment continued the exclusive dealing between GTL and York County.

24.     In the ensuing ten-year period between 2009 and 2019, the ICP Agreement was amended seven additional times. On information and belief, York County did not conduct a competitive procurement that solicited proposals from other potential telecommunications providers before entering into any of these amendments. By the time of the eighth amendment in 2019, York County had been in an exclusive dealing contract with GTL or its predecessor in interest for more than 14 years.

**C.      Patent Litigation Between Smart Communications and the York Defendants**

25.     Smart Communications is a pioneer and national leader in the development of ICS. For example, Smart Communications developed and provided the first kiosk-based electronic messaging system for inmates. In addition, Smart Communications created groundbreaking correctional postal mail contraband elimination technology for correctional facilities.

26.     Among other things, this groundbreaking technology allows inmates to receive written communications from family and friends, while permitting prison authorities to prevent the introduction of prohibited items into the prison, by eliminating physical postal mail transmitted to an inmate. Postal mail is the primary method for introducing illegal drugs, contraband, and secret communications in correctional facilities. Thus, eliminating the transmission of outside physical postal mail promotes prison safety.

27.     HLFIP owns the valuable intellectual property in this correctional postal mail contraband elimination technology. Smart Communications' products and systems utilizing its patented technology are branded MailGuard® and MailGuard Postal Mail Elimination® and patented as United States Patent No. 10,291,617 (the "Asserted Patent" in the related Patent Infringement Litigation described below). Smart Communications' CEO, Jonathan Logan, invented the patented technology.

28.     After Smart Communications became aware that YCP used a postal-mail-elimination system that infringed the Asserted Patent, it asserted its patent rights.

29.     In a January 7, 2020 letter to then-YCP Warden Clair Doll, Smart Communications, through counsel, provided a copy of the Asserted Patent and requested that the YCP and Mr. Doll cease and desist from their infringing activities.

The letter explained that their implementation and use of unlicensed services and technologies acquired from third-party TextBehind, Inc. was an unauthorized appropriation of Smart Communications' valuable intellectual property.

30.    On February 3, 2020, Smart Communications filed a Complaint for Patent Infringement in this District. The case was assigned Civil Action No. 1:20-cv-00186-CCC (hereinafter "Patent Litigation"). That lawsuit is pending before the Chief Judge of this Court, the Honorable Christopher C. Conner. Defendants in the Patent Litigation include York County and YCP.

31.    GTL is not a named party to the Patent Litigation.

32.    The Patent Litigation defendants filed their answer to the complaint on March 5, 2020, which they later amended to assert declaratory judgment counterclaims of noninfringement and invalidity. (Dkts. 7, 28.)

33.    The Court entered a case management schedule on June 24, 2020. (Dkt. 22.)

34.    In August 2020, pursuant to an agreement between counsel, principals were identified who could communicate directly to discuss settlement: former warden Mr. Doll was the principal for the defendants, and Mr. Logan, the CEO of Smart Communications, was the principal for the plaintiff.

35.    Thereafter, counsel for the parties arranged for Mr. Doll and Mr. Logan to directly communicate. And they did.

36.     The principals first communicated directly on Tuesday, August 25, 2020. During their discussions, Smart Communications learned that YCP's ICS contract with GTL would expire in December 2020 and became aware of the financial terms of that contract.

37.     The next day, Mr. Logan forwarded Mr. Doll marketing materials that highlighted Smart Communications' various inmate communication technologies and services.

38.     Mr. Doll replied, stating "[i]mpressive options and overall system." He also asked to schedule another call with Mr. Logan for the following day.

39.     During their second call, Mr. Doll invited Mr. Logan to meet with him and his team at YCP so that they could discuss in person a resolution of the Patent Litigation and to have Smart Communications present to the YCP team an overview of Smart Communications' inmate communication services included in the marketing materials, including Smart Communications' telephone system and services.

**D.     Smart Communications' Contract Proposal for Superior ICS at YCP**

40.     At Mr. Doll's invitation, on September 2, 2020, Mr. Logan and two other Smart Communication employees met with him and his team for two hours at YCP during which the Smart Communications team described Smart

Communications' inmate communications solutions and presented Mr. Doll with a generous offer to implement Smart Communications' services at YCP immediately.

41.    Following their in-person meeting, Mr. Logan immediately emailed Mr. Doll a copy of Smart Communications' PowerPoint presentation and proposal, which including the following: Smart EVO - Inmate phone system with lower rates by almost half and double the commission guarantee; JailTracker™ fully integrated offender management system at zero cost; SmartInmate™ Electronic Messaging System with free messaging; MailGuard Postal Mail Elimination® System at no cost; MailGuardLegal™ Legal Mail Cart at no cost; SmartVisit™ Video Visitation system on inmate tablets; SmartTablet™ Devices at no cost; SmartEd™ & SmartReentry™ Modules at no cost; and a Free inmate Law Library at no cost.

42.    Among other things, Smart Communications' proposal would have more than doubled York County's annual ICS commission received from GTL— from approximately $900,000 per year, to a baseline guaranteed $2 million per year based on the same number of inmates, while providing more services for inmates at no cost to YCP.

43.    In addition, Smart Communications' proposal would have reduced by approximately fifty percent the rates paid by inmates and their families, friends, and attorneys for inmate telephone calls.

44.     Following his email receipt of the proposal, Mr. Doll responded to Mr. Logan by email, "Thank you. You brought your A game today that is for sure. I will review your proposal and get back to you. Safe travels home."

45.     Shortly thereafter, on that same day, Mr. Doll again emailed Mr. Logan, stating "Thanks again for taking the time to stop by and provide the presentation; especially, during such a pandemic. You impressed Shawn and Adam and, as a result, I am going to start reaching out to the other facility administrators as references. Can you provide the list of references for me?"

46.     Per Mr. Doll's request, Smart Communications provided several references for his consideration.

47.     Mr. Doll further asked "I have two requests, the discovery due date is fast approaching. First, would you agree to extend the due date by 30 days? This would give us some time to make the reference checks and for me to formulate a recommendation to the our [*sic*] Prison Board of Inspectors. Second, if I receive interest, would you provide another presentation (it can be by Zoom) to some of our partners (local law enforcement, etc.)?" Mr. Logan promptly agreed to both requests.

48.     On September 16, 2020, Mr. Doll emailed Mr. Logan, stating that "I started reaching out to your references this week. Good feedback. I will be speaking with the BOP here shortly. I would like to set up a call next week if you [have] time to go over your proposal. Do you have time Tuesday or Wednesday afternoon?"

13

49.     After confirming another call for September 22, 2020, Mr. Doll requested that Mr. Logan "please send an example contract."

50.     Also on September 16, 2020, at the Patent Litigation defendants' request, the parties jointly moved to stay the Patent Litigation "so that [the parties] can focus their energies on reaching a resolution of their dispute;" the Court entered a stay on September 17, 2020. (Dkts. 29-30.)

51.     On September 21, Mr. Logan emailed Mr. Doll a draft contract.

52.     On September 22, Messers. Logan and Doll spoke by telephone. During their call, they spoke about the draft contract, and Mr. Doll remarked about how impressed he was with the draft contract but that he needed to first present the draft contract to the Prison Board and York County Commissioners for approval.

53.     A week later, Mr. Doll emailed Mr. Logan asking for some additional availability to "discuss the contract a bit further" and another telephone conversation ensued.

54.     Following that conversation, on October 3, 2020, Mr. Logan revised the original draft contract to address matters Mr. Doll and he discussed by telephone, and emailed Mr. Doll an amended draft contract for Smart Communications' ICS to be implemented at YCP.

55.     On October 7, 2020, Mr. Doll provided "recommended changes" to the amended draft contract from "[o]ur lawyers." He specifically remarked that the

guaranteed financial terms of the amended draft contract "was a great selling point to our Prison Board and Commissioners" and that YCP's current GTL-provided electronic rounds system "needs to be replaced." Mr. Doll then asked Mr. Logan if they could further discuss the amended draft contract within the next day or two.

56.     In several conversations with others, Mr. Doll repeatedly commented that he was very impressed with Smart Communications' inmate communication technologies and services, that he had experienced a myriad of problems with the existing GTL tablets, that the existing GTL investigative tools were subpar and inferior to what Smart Communications was offering, and that that Smart Communications' system had greater functionality than the GTL system.

57.     After speaking at length on October 14, 2020 about the amended contract, and at Mr. Doll's request, Smart Communications agreed to provide an in-depth demonstration of the JailTracker™ OMS system to the YCP team.

58.     On October 16, Mr. Logan provided a second-amended draft contract that reflected minor changes that the two discussed by telephone.

59.     The following workday, on October 19, 2020, Mr. Doll stated "[a]s we discussed, we will need the tablets and telephone services to go live on 12/15/2020. I am also working on a timeline for the remainder of the services to be implemented. I'll have that to you this week."

60.    The two exchanged more emails that week culminating in Mr. Logan's October 23, 2020, email confirmation that all of YCP's requested services were included in the second-amended draft contract.

### E.    GTL Intervenes in the Ongoing Contract Negotiations

61.    Five days later, on October 28, 2020, GTL's outside counsel Michael Specht of Sterne Kessler Goldstein & Fox ("Sterne Kessler") mailed a purported Fed. R. Ev. 408 letter to Smart Communications' CEO Mr. Logan, demanding that he direct Smart Communications to drop the Patent Litigation within five days.

62.    Mr. Specht sent his letter directly to a non-attorney individual who he knew or should have known had authority to bind Smart Communications, an entity that Mr. Specht knew was represented by counsel, in direct violation of Rule 4.2 of the Pennsylvania Rules of Professional Conduct.

63.    In his letter, Mr. Specht informed Mr. Logan that his firm represented GTL, that York County was a valued customer of GTL, and that GTL thus "has a significant interest in resolving" the Patent Litigation, even though GTL was not a party to that litigation, it was not alleged in that litigation that GTL provided the accused technology at issue, and that litigation already had been pending for nine months. Mr. Specht demanded that Smart Communications dismiss its lawsuit against York County with prejudice.

16

64.    The letter then went on unnecessarily to inform Mr. Logan that Sterne Kessler had reviewed two patents issued to Smart Communications and concluded they purportedly had "fatal issues" that could be raised in an expedited procedure with the U.S. Patent and Trademark Office. Finally, the letter noted that Sterne Kessler had performed an "initial analysis" of Smart Communications' "product and service offerings" in view of GTL's "over 200 U.S. patents" and supposedly determined that "many of Smart Communications' products and services infringe one or more of GTL's patents."

65.    While the letter should not have been sent to a non-attorney, it does not take a law degree to understand the explicit threat in Mr. Specht's letter: drop the Patent Litigation or GTL and Sterne Kessler will tie up Smart Communications in numerous legal challenges on several, unrelated fronts, with a tremendous burden of corresponding legal fees.

66.    Prior to sending his improper letter, Mr. Specht, along with multiple attorneys for Sterne Kessler, secretly visited York County and YCP to give an in-person presentation to its officials without inviting (or even notifying) York County's and YCP's counsel of record in the Patent Litigation.

67.    As part of their presentation, attorneys for Sterne Kessler made multiple false claims and misrepresentations about Smart Communications, including knowingly false and defaming statements regarding Smart Communications'

17

viability as a company, Smart Communications' patents, and Smart Communications' services in relation to GTL's patents.

68.    One such false and detrimental statement was that Smart Communications had purchased a company named Lattice and that, because of Smart Communications' alleged arrangement with Lattice, if YCP proceeded to replace GTL's phone equipment with Smart Communications' phone equipment, GTL had a right to and would exercise its right to seize Smart Communications' equipment based on an alleged judgment that GTL had received against Lattice, thereby leaving YCP without any communications services for the duration of its potential contract with Smart Communications.

69.    Also, as part of Sterne Kessler's secret in-person meeting, attorneys for Sterne Kessler showed a PowerPoint presentation contending that Smart Communications' Asserted Patent allegedly was invalid and that the York Defendants should not settle the Patent Litigation.

70.    In addition, Sterne Kessler attorneys claimed that Smart Communications was infringing multiple GTL patents, and that GTL would sue Smart Communications and immediately obtain an injunction to prohibit Smart Communications from providing certain services that were the subject of Smart Communications' proposal to York County and YCP.

71.     Sterne Kessler, through its representation of GTL, also used this secret in-person meeting with the York Defendants to convince them to fire their existing outside patent litigation counsel and to hire Sterne Kessler to represent the York Defendants' interests in the Patent Litigation.

### F.     Meanwhile, Smart Communications Remains on Track to Contract with YCP

72.     On October 30, 2020, Smart Communications' Lisa Eddy emailed Mr. Doll "to see how things are going with the signing of the contract[]" and separately, the JailTracker representative emailed Mr. Doll "to confirm our zoom demo next week Tuesday [] to view the JailTracker software."

73.     On November 2, 2020, Mr. Logan emailed Mr. Doll about the status of the execution of the contract and emphasized that Smart Communications was "getting things in place to make sure we are ready for the December 15th deadline."

74.     In that same email, Mr. Logan summarized the Sterne Kessler letter he received recently on behalf of GTL: "[GTL] sent me a letter threatening that if we don't drop the [Patent Litigation], they will sue us on several fronts, including on some of their patents, that they are now claiming we violate (however they failed to explain how) and they threated to try and get our patents killed at the patent office."

75.     On November 5, 2020, Smart Communications' outside Patent Litigation counsel contacted the York Defendants' Patent Litigation counsel of record (before they were fired and replaced with Sterne Kessler) to discuss the

19

upcoming deadline for the parties to report to the Court on the progress towards settlement as required by the terms of the stay that had been entered. York Defendants' then-Patent Litigation counsel indicated that the York Defendants were still moving towards accepting Smart Communications' contract proposal.

76.     The JailTracker Zoom demonstration occurred on November 10, 2020. Multiple people from YCP and Smart Communications attended, and throughout the presentation, Mr. Doll repeatedly stated that YCP would be transitioning from GTL's dated system to Smart Communications' and JailTracker's systems.

77.     After the demonstration, Mr. Doll called Mr. Logan, clarified that he was not involved in drafting Sterne Kessler's letter, and summarized the substance of the Sterne Kessler lawyers' prior discussions with him: among other things, that (1) Smart Communications allegedly had capacity issues and would be unable to deploy the necessary equipment to meet the December 15, 2020 contract deadline, (2) GTL had a Court judgment and intended to seize Smart Communications' phone equipment, (3) Smart Communications allegedly lacked financial resources to defend against GTL's threatened full-scale litigation assault, and (4) Smart Communications would be unable to indemnify and defend the York Defendants in litigation.

78.     Based on assurances from York Defendants' Patent Litigation counsel of record, on November 13, 2020, Smart Communications agreed to join the York

Defendants in representing to the Court presiding over the Patent Litigation that "[t]he Parties have engaged and continue to engage in good-faith settlement discussions aimed at resolving this action and reaching a resolution of their dispute." (Dkt. 31.)  With this representation, the stay of the Patent Litigation remained in place.

79.    But the York County Commissioners did not include the Smart Communications' contract proposal in their December 2 Meeting Agenda, nor was any discussion of the Smart Communications' contract proposal taken at that meeting.

80.    During the first week of December, Mr. Doll continued to outwardly indicate a desire to move forward with Smart Communications' contract proposal and asked for Smart Communications to provide a high-level written summary for Mr. Doll and the YCP to present to the York County Commissioners at a special meeting on December 9, 2020. Smart Communications obliged and provided the requested summary immediately.

## G.    YCP Contracts with GTL Instead and Ambushes Smart Communications

81.    Upon information and belief, Smart Communications' summary, proposal, and contract were not presented to the York County Commissioners for approval on December 9, 2020, or at any time. Rather, on December 16, 2020, the York County Commissioners approved a Contract Agreement Amendment between

York County on behalf of YCP and GTL "for continuation of month-to-month contracted services until the final agreement is established."

82.     Recognizing that progress towards settlement had at the very least stalled, Smart Communications moved to lift the stay on December 22, 2020. (Dkt. 32.) The Court granted the Motion and lifted the stay on December 28, 2020. (Dkt. 33).  According to the Court's Order, the parties in the Patent Litigation were to meet and confer and submit a proposed pretrial and trial schedule by January 18, 2021. (*Id.*)

83.     On January 7, 2021, Smart Communications' counsel emailed York Defendants' counsel-of-record for available times to conduct the meet-and-confer.

84.     On January 12, York Defendants' counsel informed Smart Communications' counsel that they had been fired, to be replaced by the Sterne Kessler lawyers. On January 14, 2021, the York Defendants filed a Motion for Extension of Time to conduct the Court-ordered meet and confer so that the Sterne Kessler lawyers could appear. (Dkt. 35.)

85.     On January 18, the York Defendants notified JailTracker that they were not moving forward with the contract with Smart Communications and JailTracker. The York Defendants never communicated their decision to Smart Communications, presumably to buy more time for their new attorneys at Sterne Kessler to prepare their litigation ambush.

86.    On January 20, 2021, the York County Commissioners approved a Contract Agreement Amendment between York County on behalf of YCP and GTL for GTL "to provide telephone and tablet services, an offender management system, indemnification provisions, and litigation support" for "five (5) additional years, commencing upon full execution of this amendment with two (2) additional automatic one-year renewals," with nothing in the Agenda or Minutes reflecting any consideration of Smart Communications' proposal (https://yorkcountypa.gov/images/pdf/commissioners/2021minutes/COMMISSIO NERS_MEETING_MINUTES_1-20-2021.pdf) (last visited October 4, 2021).

87.    According to the York County Commissioners' Meeting Agendas and Minutes, Smart Communications' contract proposal was never presented or considered.

88.    Sterne Kessler filed its appearance in the Patent Litigation on January 29, 2021. (Dkts. 37-38.) Thereafter, the Patent Litigation defendants' outside counsel of record then filed a Motion for Leave to Withdraw. (Dkt. 39.) Immediately, Sterne Kessler asked Smart Communications' counsel for an extension of time to conduct the meet and confer so that they could purportedly "get up to speed" on the case.  (Dkt. 44.)  On January 29, 2021, the parties filed a joint motion for an extension, which was granted by the Court on February 1, 2021.  (Dkt. 45.)

89.    But Sterne Kessler's request for time to "get up to speed" was just a ruse designed to obtain the professional courtesy of counsel for Smart Communications and to buy Defendants more time in preparing their attack.

90.    Shortly after asking the Court for an extension of time to "get up to speed," the Sterne Kessler lawyers launched a highly coordinated and multifaceted ambush.

91.    The Sterne Kessler lawyers filed two petitions ("Petitions") for *inter partes* review ("IPR") and accompanying expert declarations at the Patent Trial and Appeal Board of the United States Patent and Trademark Office ("PTAB") on behalf of real parties in interest, and Defendants in this matter, GTL, York County, YCP and the YCP Warden, challenging the validity of the Asserted Patent ("IPR Proceedings"). (*See* IPR2021-00444 and IPR2021-00445.) In total, the two Petitions and expert declarations were 475 pages in length, not including the more than one hundred separate files provided as exhibits.

92.    On February 10, 2021, the day after the IPR Petitions were filed, Sterne Kessler—on behalf of the Patent Litigation defendants—filed a Motion for Judgment on the Pleadings in the Patent Litigation, claiming that the Asserted Patent was invalid as a matter of law. (Dkts. 46-47.)

93.    On February 12, 2021, the Sterne Kessler lawyers filed a Motion to Dismiss the Patent Litigation altogether on additional grounds. (Dkts. 48-49.)

94.     On February 16, 2021, the Sterne Kessler lawyers filed a Motion to Stay the Patent Litigation. (Dkts. 50-51.)  To support their Motion, they argued that the Court should not spend effort litigating the underlying Patent Litigation because of GTL's and York County's IPR Petitions and the recently filed Motions for Judgment on the Pleadings and to Dismiss.  In connection with this Motion to Stay, they falsely claimed and misrepresented to the Court that "[a] stay will not unduly prejudice or tactically disadvantage Plaintiff *because the parties are not competitors*."  (Dkt. 51 at 7 (emphasis added.))

### H.     GTL's Unlawful Actions

95.     Rather than compete on the merits with Smart Communications, GTL sought to sabotage Smart Communications' proposal by making a series of false and misleading statements about Smart Communications to the York Defendants.  GTL falsely suggested to the York Defendants that: (a) Smart Communications would not be able to fulfill the contractual offer set forth in its proposal; (b) Smart Communications did not own the rights to the systems and technology needed to perform the contractual duties set forth in its proposal, and (c) if Smart Communications was awarded the ICS contract, there would be an interruption in telephone service available to the inmates, and disorder at the prison would ensue. On information and belief, GTL, through its Sterne Kessler lawyers, made these false and misleading statements to Mr. Doll.

96.     In addition to these false, misleading, unfair, and tortious statements, GTL entered into discussions with Mr. Doll on a completely separate matter—the Patent Litigation—that involved technology provided at YCP by an unrelated third-party. GTL and Mr. Doll discussed the Patent Litigation and decided that GTL would take complete control of that lawsuit. Specifically, GTL will select counsel and determine arguments to be advanced and maneuvers to be taken in that lawsuit.

97.     GTL was so motivated to keep a stranglehold on ICS at YCP that it offered York County a blank check: if Mr. Doll would extend the ICS Agreement with GTL, GTL would indemnify York County, YCP, and Mr. Doll for all attorneys' fees and damages in the Patent Litigation, and pay the balance owed to their former and then-fired patent litigation counsel.

98.     GTL and Mr. Doll also recognized that this series of false, misleading, unfair, and tortious statements, and the unlawful agreements that followed, could constitute tortious interference with contractual relations between Smart Communications and York County. They therefore agreed that GTL would also indemnify York County, YCP, York County Prison Board of Inspectors, and Mr. Doll for claims of tortious interference.

99.     GTL's proposal was inferior to Smart Communications' proposal in many respects. For instance, GTL's proposal guaranteed an annual commission to York County of $1 million, while Smart Communications' proposal guaranteed an

annual commission to York County of double that amount—a guarantee of $2 million per year.

100.   In addition, on information and belief, GTL's prior rates were $0.25 per minute (depending on call type, and not including transaction fees); Smart Communications offered to reduce those rates by fifty percent, yet YCP and GTL ultimately agreed to a rate of $0.16 per minute.

101.   GTL and Mr. Doll were aware that Smart Communications and York County were negotiating the provision of ICS by Smart Communications.

102.   Defendants acted for the purpose of preventing Smart Communications from entering into a contract with York County on behalf of YCP.

103.   On information and belief, GTL, through its Sterne Kessler attorneys, communicated numerous false and misleading statements to Mr. Doll about Smart Communications' ability to perform under the prospective contract.

104.   On information and belief, GTL, through its Sterne Kessler attorneys, intended to interfere with the Smart Communications' prospective contractual relationship.

105.   On information and belief, GTL was under no privilege to interfere with the prospective contractual relationship between Smart Communications and York County.

106.   These acts resulted in York County not entering into a contract with

27

Smart Communications for ICS at YCP.

107.   Because Smart Communications' proposal offered superior services to York County, and because Smart Communications had demonstrated its capability to provide such services at other correctional facilities, it is likely that Smart Communications would have been the winning bidder but for the anticompetitive and tortious conduct of Defendants.

**I.     Stop-Gap Measure—ICP Amendment #9**

108.   On or about December 22, 2020, the ICP Agreement was amended in a "Amendment #9 to Inmate Calling Program Agreement" (hereinafter "ICP Amend. #9"). This amendment continued the exclusive dealing between GTL and York County. It provides, in pertinent part, that:

> The Parties agree that when the [ICP] Agreement ends on December 15, 2020, the [ICP] Agreement shall continue in full force and effect on a month to month [*sic*] basis.

ICP Amend. #9, ¶1. ICS Amend #9 was executed on December 22, 2020. Thus, on information and belief, the ICP Agreement had expired *a week before* the month-to-month extension set forth in ICP Amend. #9.

**J.     ICS Amendment #10—Defendants' Continued Exclusive Dealing Contract**

109.   On or about January 22, 2021, the ICP Agreement was amended in a "Amendment #10 To Inmate Calling Program Agreement" (hereinafter "ICP

Amend. #10"). This amendment continued the exclusive dealing between GTL and Defendant York County.

110.   The contract extension portion of the ICP Amend. #10 reads, in pertinent part, as follows:

> The Parties agree to extend the term of the [ICP] Agreement for five (5) additional years, commencing upon full execution of this Amendment. The Agreement shall have two (2) additional automatic one-year renewals unless [York County] provides written notice of non-renewal within sixty (60) days of the contract renewal date.

ICP Amend. #10, ¶ 1.

111.   Thus, ICP Amend. #10 could potentially extend GTL's exclusive dealing with York County for an additional seven (7) years—which would result in a twenty-five (25) year contract going back to the original executed date in 2003.

112.   The ICP Amend. #10 also includes an extremely rare early termination clause that would require York County to reimburse GTL for liquidated damages according to the following schedule:

| Termination During | Amount Due |
| --- | --- |
| Year One | $1,844,804.50 |
| Year Two | $1,475,843.60 |
| Year Three | $1,106,882.70 |
| Year Four | $737,921.80 |
| Year Five | $368,960.00 |

## K.   GTL Indemnified the Other Defendants

113.   To induce York County to accept its inferior proposal, GTL made a brazen offer—to indemnify York County for legal fees incurred and any damages

29

awarded in the Patent Litigation. GTL is not a named party to that lawsuit. Nor has it been alleged in that lawsuit that GTL was involved in the infringing activity that underlies the claims at issue in that lawsuit.

114.   York County accepted GTL's unusual offer, and the indemnification agreement became part of ICP Amend. #10. The indemnification agreement provides, in pertinent part, as follows:

2.   Indemnification of Indemnified Parities in HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. York Indemnified Parties, Pennsylvania et al. 1-20-cv-00186 (M.D.Pa.) ("Smart Communications Patent Litigation")

2.1   Company will pay the Indemnified Parties' attorneys' fees incurred prior to the execution date of Addendum #10 as a result of the Smart Communications Patent Litigation within ten (10) days of execution of Addendum #10, as well as attorney's fees and costs incurred to litigate this case to judgment after the execution date of Addendum #10. Company will indemnify, defend, protect and hold harmless the Indemnified Parties for all claims, actions, suits, financial judgment, liability, losses, costs, expenses or damages (including, but not limited to, incidental, special and consequential damages) incurred from September 1, 2018 that arise or result from or are awardee due to the actual or alleged infringement recited in the Smart Communications Patent Litigation.

ICP Amend. #10, Exhibit C: Indemnification Agreement, ¶ 2.

115.   The indemnification agreement also provides for indemnification for all "claims of tortious interference." ICP Amend. #10, Exhibit C: Indemnification Agreement, ¶ 2.2.

116.   The indemnification agreement also provides that GTL would control the Smart Communications Patent Litigation, to include selection of counsel and "determination of arguments advanced in the litigation." ICP Amend. #10, Exhibit C: Indemnification Agreement, ¶ 2.

117.   All of the contracts between GTL and York County prior to Amendment 10 were for 2 years with no penalty or liquidated damages for earlier termination.  None of those prior contracts provided for indemnification of unrelated lawsuits.  The extended length of Amendment 10, the termination penalty, and the indemnification provision were specifically added to the agreement when Smart Communications challenged GTL's exclusive provision of ICS to York County. These provisions deviated from at least 16 years of GTL's prior contractual relationship and were designed to preclude market entry competition in the York County Prison market by Smart Communications specifically and others generally.

## VII.   RELEVANT MARKET

### A.     Product Market

118.   The relevant product market in this case is the market for ICS. The inmates of the YCP and those they wish to call—family, friends, attorneys, *etc.*— have no way to communicate by phone other than through the ICS offered by York County. Nor do they have any choice in ICS provider. That too is under the exclusive control of York County. ICS is therefore an entirely distinct market from phone

services available to people other than YCP inmates. There are no reasonable substitutes for the ICS and provider of ICS supplied by York County, and a change in price for ICS has no effect on the price for any other product or service.

119.   The distinctiveness of the ICS market is underscored by the unique features of ICS as compared with phone services available to the public at large. Federal courts have routinely held that inmates do not have a constitutional right to unrestricted telephone communication, and that inmates have no legitimate expectation of privacy in their telephone conversations. Accordingly, ICS phones, like those in the YCP, are often specifically designed for the prison environment. In most, if not all, correctional facilities, calls made on ICS are subject to monitoring and recording, and there are time limitations on all calls. In the YCP, for example, inmate calls are subject to "monitoring, recording, and divulging information," and there is an "automatic twenty (20) minute time limit on all calls." https://yorkcountypa.gov/courts-criminal-justice/prison/inmate-rules-and-policies/telephone-system.html (last visited October 4, 2021). Additionally, some correctional facilities restrict inmate calls to individuals on an approved telephone list.

120.   Further setting the ICS market apart from the market for phone services available outside of the prison system, most, if not all, ICS involve special systems for billing inmates and call recipients. Typically, inmates may make debit/prepaid

calls or collect calls, which may be subject to additional service charges. ICS providers, including GTL, sometimes require individuals to set up accounts to accept collect calls from inmates. As a result of these unique features, many providers of ICS, like Smart Communications and GTL, compete only in the ICS market and do not offer phone services outside of correctional facilities.

121.   Although the YCP, like many other correctional facilities, provides inmates with postal and electronic mail services, these methods of communication are not a reasonable substitute for ICS. Neither service allows an inmate to actually speak to another person in real time like ICS. An inmate cannot hear the emotional voice of a loved one or have a back-and-forth discussion about legal strategy through the mail. Short of in-person visits, which are subject to myriad restrictions and limitations, ICS is the only method by which inmates can actually speak to people.

### B.   Geographic Market

122.   The relevant geographic market is the YCP. The "consumers" here—the inmates of the YCP—cannot look beyond the prison walls for ICS. They have no access to ICS other than that available to them within the prison. The YCP is their one and only marketplace.

## VIII.  <u>MARKET POWER & MARKET FORECLOSURE</u>

123.   As a direct result of Defendants' unlawful and anticompetitive actions, Smart Communications was completely foreclosed from providing ICS to inmates

at YCP. York County's market power over ICS in the YCP is total. For the last at least 16 years, it has bestowed that power exclusively to GTL. Subject to the approval of York County, and applicable FCC regulations on interstate calls, GTL may charge whatever rates and impose whatever terms its wishes for ICS.

124.   There is no competition for ICS within the YCP. York County has made the entry barriers to GTL's competitors impregnable by awarding GTL an exclusive dealing contract that is renewed at every opportunity without fail. GTL has been granted a complete monopoly resulting in a total foreclosure of the market.

125.   GTL also has significant market power in the ICS market within the State of Pennsylvania. While GTL does not provide ICS to any state correctional institutions in Pennsylvania, upon information and belief, GTL holds approximately 81% of the ICS market in Pennsylvania's county correctional facilities, and approximately 80% of the ICS market in Pennsylvania's federal prisons. As a result, GTL possesses an estimated 51.38% of the ICS telephone market in Pennsylvania.

126.   Nationally, GTL and another company, Securus Technologies, LLC, dominate the market for ICS. Together, the two companies account for at least 80% of the telephone calls placed by inmates in correctional facilities around the country. The companies have repeatedly been alleged to have misused their effective duopoly. For example, according to a class action lawsuit pending in the United States District Court for the District of Maryland, GTL and Securus are alleged to

have conspired for over a decade "to fix inflated prices for calls between incarcerated individuals and their family members, friends, attorneys, and others, while also repeatedly lying to local governments and their own customers about the costs of those calls in order to charge the inflated prices." *Albert et al. v. Global Tel*Link Corp. et al.*, Civil Action No. 8:20-cv-1936, Dkt. 1 at ¶ 1, (D. Md. June 29, 2020).

## IX.   <u>HARM TO COMPETITION</u>

127.   York County's exclusive dealing arrangement with GTL has significant anticompetitive effects that are not counterbalanced by any procompetitive benefits. Inmates and call recipients are forced to pay rates for ICS that far exceed the rates that they would pay in a competitive market. This is reflected in the savings that inmates and their family, friends, and attorneys would have received under Smart Communications' proposal for ICS at the YCP.

128.   York County citizens are also harmed by the anticompetitive acts of the Defendants. But for the unlawful acts described herein, York County would have received an additional $1 million per year in commissions under Smart Communications' proposal, money that would have benefited York County citizens and taxpayers.

129.   GTL profits excessively from its anticompetitive arrangement. Indeed, GTL was so concerned about the possible loss of its lucrative and extremely profitable arrangement with York County that it took the highly unusual step of

offering to defend and indemnify York County, YCP, and former Warden Mr. Doll in the Patent Litigation at the potential cost of millions of dollars.

130.   There is simply no pro-competitive justification for the unlawful acts of the Defendants. Yet as a direct result of Defendants' unlawful and anticompetitive acts, Smart Communications has suffered economic harm. Among other things, had Smart Communications been awarded the ICS contract, it would have received substantial monetary profits over the term of the contract.

## X.   <u>OTHER INAPPROPRIATE ACTION</u>

131.   Upon information and belief, in preparing the IPR Petitions, GTL's Sterne Kessler lawyers collaborated with at least some of the lawyers representing defendants VendEngine, Rutherford County, and Rutherford County Adult Detention Center (the "Rutherford Defendants") in another patent infringement suit in which Smart Communications is enforcing the Asserted Patent ("Rutherford Litigation").

132.   GTL is a competitor of VendEngine.

133.   The IPR Petitions include primary references and combinations of prior art references included in the invalidity contentions prepared by the Rutherford Defendants.

134.   Upon information and belief, GTL's Sterne Kessler lawyers communicated about the Rutherford Defendants' invalidity positions for the

Asserted Patent prior to filing the IPR Petitions with at least one of the lawyers representing the Rutherford Defendants.

135.   Upon information and belief, prior to preparing the IPR Petitions, GTL's Sterne Kessler lawyers received from at least one of the lawyers representing the Rutherford Defendants the invalidity contentions they served in the Rutherford Litigation.

136.   Because the Rutherford Litigation had been pending for more than a year, the Rutherford Defendants could not file their own IPR petitions to challenge the Asserted Patent at the time GTL filed the IPR Petitions. Notwithstanding, the Rutherford Defendants have challenged the validity of the Asserted Patent in the underlying patent infringement litigation and would benefit if the PTAB invalidated the Asserted Patent in the IPR Proceedings.

137.   Upon information and belief, GTL's Sterne Kessler lawyers received information from at least one of the lawyers representing the Rutherford Defendants to include and support GTL's positions in the IPR Proceedings.

138.   For example, GTL's Sterne Kessler lawyers communicated about a stipulation to be used in the IPR Proceedings with at least one of the lawyers representing the Rutherford Defendants.

139.   GTL attached as an exhibit to its Request for Rehearing filed at the PTAB for IPR2021-00444 ("Request for Rehearing") the stipulation its counsel

prepared in collaboration with at least one of the lawyers representing the Rutherford Defendants.

140.  On information and belief, the Rutherford Defendants desire review of the Asserted Patent at the PTAB in IPR2021-00444 as evidenced, for example, by their cooperation with GTL in support of the Request for Rehearing.

141.  By coordinating substantively with at least one of the lawyers representing the Rutherford Defendants in connection with the IPR Proceedings, GTL violated the one-year time bar under 25 U.S.C. § 315(b).

## XI.  <u>VIOLATIONS ALLEGED</u>

**COUNT I**
**Unlawful Exclusive Dealing In**
**Violation of Section 1 of the Sherman Act**
**(Against All Defendants)**

142.  Smart Communications adopts and incorporates by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this Complaint.

143.  The Clayton Act, 15 U.S.C. § 15, authorizes a private right of action for an individual or business entity injured by a violation of any antitrust law. 15 U.S.C. § 15(1).

144.  This cause of action is brought under Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or

conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

145.   GTL maintains a monopoly at YCP, where its services command a market share of 100%.

146.   GTL requires its customers to enter into its standardized long-term inmate calling program agreement as a condition of having its services distributed in correctional facilities.

147.   York County and GTL have been in an exclusive dealing contract for the supply of ICS at the YCP for over 16 years. The latest contract renewal ensures that relationship will continue for at least another five years.

148.   Paragraph 9(b) of GTL's "Inmate Calling Program Agreement" titled "Exclusivity and Right of First Refusal" requires that Defendants ("Premise Provider") deal *exclusively* with GTL for *all products and services* now and in the future, for products it may or may not have, at facilities that have yet to be created:

> Premises Provider will not allow any products or services that compete with those supplied by [GTL] during the term of the Agreement to be, or to remain, installed at any Premise Provider facilities, including present and future Premise Provider locations.
>
> [GTL] will have the exclusive right to provide the products and services implemented at Premises Provider facilities through the Tablets, and otherwise through the Agreement, and those other inmate communication, educational or entertainment products or services sought by Premises Provider during the term of the Agreement, including any products or services that may be delivered through a Tablet, whether the products or services are for inmates located at a

Premises Provider facilities [*sic*] or at third-party facilities; provided, however, that Company may choose to not exercise this exclusive right.

[GTL] will also have the exclusive right to provide Premises Provider the products and services delivered under the Agreement for the period after its termination if [GTL] matches the material financial and services conditions of a bona fide offer of any third party to provide these products and services, or any portion thereof, that Premises Provider is prepared to accept.

Premises Provider will provide [GTL] with the terms of such third-party offer in writing and no less than ten (10) business days to exercise its rights herein.

Upon exercise by [GTL], the Agreement will renew with the modified financial and services terms for the extended period contemplated by the third-party offer.

149.   The exclusive-dealing contract between York County and GTL has totally foreclosed—and will continue to foreclose well in future—any competition for ICS within the YCP. York County has given GTL a complete monopoly. The contract thus has substantial adverse effect on competition by eliminating it. The current contract, Amendment 10, further precludes entry level competition through its extended length, indemnity and buy out provisions, and liquidated damages, terms which were not included in any of the prior contracts between the York Defendants and GTL.

150.   The exclusive-dealing contract between York County and GTL further deters new businesses from investing funds to create and develop innovative, higher

quality inmate communication technologies for use in correctional facilities because of the barrier created by such contracts.

151.   Defendants have engaged and continue to engage in a continuous course of unlawful anticompetitive conduct.

152.   There are no offsetting pro-competitive effects that benefit consumers, *i.e.*, the inmates of the YCP, their loved ones, their friends, and their attorneys. The inmates have been and will continue to be forced to receive subpar service and pay excessive rates for calls made through the ICS supplied by GTL. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive effects of Defendants' conduct and could have been achieved through less anticompetitive and less harmful means.

153.   Nor are there any safety considerations or other special concerns related to the prison environment that justify a total elimination of competition.

154.   This illegal restraint on trade is the result of GTL's exercise of its market power and York County's complete control over the supply of ICS to the YCP, which provided less revenue for the County and higher rates for the inmates. GTL is making excessive profits as a direct result of its anticompetitive activities.  It is also the result of GTL's dominance as supplier of ICS, which it has wielded to ensure that York County does not turn to alternative suppliers of ICS, like Smart Communications, that offer better services and lower costs to the inmates.

155.   Defendants' illegal restraint on trade affects interstate commerce because in selecting an ICS provider, York County enters into the national market to contract with businesses like GTL and Smart Communications, which are based outside of Pennsylvania and engage in commercial activity, including the supply of ICS, throughout the United States. Additionally, inmates at the YCP make interstate calls using the ICS supplied by GTL, and call recipients both within and outside of Pennsylvania pay for those calls by depositing funds into the stream of commerce.

156.   As a result of Defendants' illegal restraint on trade, Smart Communications has suffered and continues to suffer damages. Additionally, Smart Communications has suffered and continues to suffer irreparable injury for which no adequate remedy at law exists and therefore seeks an injunction ending Defendants' anticompetitive conduct.

## COUNT II
### Tortious Interference With Prospective Business Relations
### (Against GTL)

157.   Smart Communications adopts and incorporates by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this Complaint.

158.   Smart Communications had a prospective contractual relationship with York County to provide ICS and other services to the YCP.

159.   GTL intentionally and maliciously interfered with the prospective

contract between Smart Communications and York County by falsely representing to York County officials that: (a) Smart Communications would not be able to fulfill the contractual offer set forth in its proposal; (b) Smart Communications did not own the rights to the systems and technology needed to perform the contractual duties set forth in its proposal; and (c) if Smart Communications were awarded the ICS contract, there would be an interruption in telephone service available to the inmates, and disorder at the prison would ensue.

160.   There was no legitimate justification for these false and misleading statements. GTL intended to harm Smart Communications by preventing York County from entering into a contract with Smart Communications, and to preserve its own long-standing exclusive dealing contract with York County, which it succeeded in doing.

161.   York County officials responded to GTL's false and misleading statement by not awarding the ICS contract to Smart Communications.

162.   GTL's malicious interference with the contract negotiations caused Smart Communications to suffer significant financial harm, as the anticipated 5-year contract with York County would have generated significant revenue for Smart Communications, in spite of its generous proposed revenue sharing to York County and lower costs to YCP inmates, in an amount to be proven at trial that will exceed $75,000.00.

**COUNT III**
**Unfair Competition**
**(Against GTL)**

163.   Smart Communications adopts and incorporates by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this Complaint.

164.   The same tortious conduct described in Count II above also constitutes unfair competition.

165.   GTL intentionally and maliciously used false and misleading statements in its dealings with York County, to unfairly compete with Smart Communications in the award of the ICS contract, in that GTL made false representations to York County officials, including that: (a) Smart Communications would not be able to fulfill the contractual offer set forth in its proposal; (b) Smart Communications did not own the rights to the systems and technology needed to perform the contractual duties set forth in its proposal; (c) if Smart Communications were awarded the ICS contract, there would be an interruption in telephone service available to the inmates, and disorder at the prison would ensue; and (d) GTL would sue Smart Communications for patent infringement on multiple of GTL's patents and obtain an injunction, thereby preventing Smart Communications from providing its services.

166.   York County officials responded to GTL's acts that constituted unfair

competition by not awarding the ICS contract to Smart Communications.

167.   GTL's acts that constituted unfair competition caused Smart Communications to suffer significant financial harm, as the anticipated 5-year contract with York County would have generated significant revenue for Smart Communications, in spite of its generous proposed revenue sharing to York County and lower costs to YCP inmates, in an amount to be proven at trial that will exceed $75,000.00.

## COUNT IV
## Champerty and Maintenance
## (Against GTL)

168.   Smart Communications adopts and incorporates by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this Complaint.

169.   GTL lacks an independent legal or equitable interest in the Patent Litigation between Smart Communications and the York Defendants.

170.   GTL is an intermeddling stranger whose involvement and control over the Patent Litigation constitutes champerty and maintenance wherein its involvement is clearly officious and for the purpose of financially burdening and otherwise extending litigation with Smart Communications by financing and controlling the Patent Litigation, expanding the scope of the Patent Litigation by filing numerous meritless motions, and bringing additional legal proceedings before

the United States Patent Trial and Appeal Board, for the express purpose of improperly leveraging litigation expenses to be borne Smart Communications as threatened by Mr. Specht in his letter to Mr. Logan.

171. The Indemnification Agreement is still in effect and defines the relationship between GTL and the York Defendants with respect to financing and control of the Patent Litigation between Smart Communications and the York Defendants. *See* Ex. C at ¶ 2.

172. The Indemnification Agreement mandates that GTL will reimburse the York Defendants' prior counsels' legal fees and then select new counsel to replace prior counsel who will lead the defense of the Patent Litigation. *See id*.

173. The Indemnification Agreement further provides that GTL will pay any judgment levied against the York Defendants in the Patent Litigation. *See id*.

174. GTL did not provide and does not have any rights in the technology provided to the York Defendants by a third-party vendor at issue in the Patent Litigation.

175. GTL did not have any rights in the technology at issue in the Patent Litigation at the time it entered into the Indemnification Agreement.

176. The Indemnification Agreement was created solely for the purpose of allowing GTL to fund, participate, and control the Patent Litigation and to otherwise

stifle Smart Communications' enforcement activities relating to and its valid rights in its United States Patent.

177.   Smart Communications has been and continues to be irreparably damaged as a result of GTL's champertous arrangement with the York Defendants.

## XII.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Smart Communications respectfully requests that this Court enter judgment in its favor as follows:

1.   Declaring that the aforesaid agreements unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.   Finding that the aforesaid activities and agreements constitute tortious interference with contractual relations, unfair competition, and champerty in violation of Pennsylvania law;

3.   Enjoining each Defendant permanently from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the illegal agreements or any other agreements between and among Defendants in which have a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

4.   Awarding Smart Communications general and special damages according to proof in an amount that exceeds $75,000.00;

5.   Awarding Smart Communications treble damages pursuant to its

Sherman Act claim;

6.      Awarding Smart Communications reasonable attorneys' fees to the

extent allowed by law;

7.      Awarding Smart Communications its costs of suit; and

8.      Awarding Smart Communications such other relief as the Court may

deem just and proper.

## JURY TRIAL DEMAND

Demand is hereby made that this case, to the extent possible, be tried to a jury.

Dated: October 4, 2021          Respectfully submitted,

_____/s/ Ramsay Whitworth_____
Ramsay M. Whitworth (PA Bar No. 85208)
rwhitworth@silvermanthompson.com
M. Evan Corcoran (*pro hac vice* forthcoming)
ecorcoran@silvermanthompson.com
William N. Sinclair (*pro hac vice* forthcoming)
bsinclair@silvermanthompson.com
Silverman, Thompson, Slutkin & White, LLC
201 N. Charles St., Suite 2600
Baltimore, MD 21201
Telephone:   (410) 385-2225
Facsimile:    (410) 547-2432

Katrina M. Quicker (*pro hac vice* forthcoming)
kquicker@quickerlaw.com
Quicker Law, LLC
Two Ballpark Center
800 Battery Avenue, SE
Suite 100
Atlanta, GA 30339

Telephone:   (678) 750-0450
Facsimile:   (470) 533-1182