## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SMART COMMUNICATIONS HOLDING, INC., *et al.*, | : : : | Civil No. 1:21-CV-01708 |
| Plaintiffs, | : : | |
| v. | : : | |
| GLOBAL TEL-LINK CORPORATION, *et al.*, | : : : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

This case involves allegations of anticompetitive behavior brought under the Sherman Act, 15 U.S.C. § 1 (against all Defendants), and tortious interference with prospective business relations, unfair competition, and champerty and maintenance against Defendant Global Tel-Link Corp. ("GTL"). (Doc. 1.) The other Defendants in this case include: York County, Pennsylvania ("York County"), York County Prison ("YCP"), and Mr. Adam Ogle, in his official capacity as acting Warden of YCP ("Warden Ogle") (collectively "the York Defendants").

Presently before the court is Plaintiffs' motion for preliminary injunction, which seeks to invalidate the indemnification agreement between GTL and the York Defendants in the related patent litigation[1] based on a theory of maintenance. (Doc. 62.) The court notes that this is not a request to preserve the status quo, as

---

[1] *See HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. York County, et al.*, 1:20-CV-00186

GTL has selected and paid for counsel and is indemnifying the York Defendants in the patent litigation.  Thus, this is a request for mandatory injunctive relief to force the counsel retained by GTL to withdraw from the patent litigation and cease defending the York Defendants, which would require the York Defendants to obtain new counsel in that case.  For the reasons that follow, Plaintiffs' motion for preliminary injunction is denied.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs Smart Communications Holding, Inc. and HLFIP Holding, Inc., d/b/a Smart Communications IP Holdings (collectively "Plaintiffs") filed a complaint against GTL and the York Defendants alleging violations of the Sherman Act and state-law claims of tortious interference with prospective business relations, unfair competition, and champerty and maintenance.  (Doc. 1.) All four counts of the complaint relate, in full or in part, to GTL's conduct in relation to and during the pendency of the patent litigation.  (*Id.*)

The patent litigation was initiated via complaint on February 3, 2020.  (*Id.* ¶ 30.)  The complaint alleges infringement by the York Defendants of Plaintiffs' MailGuard technology, which involves processing postal mail for inmates.  (*Id.* ¶¶ 26–30.)  Several months after the complaint was filed, counsel[2] arranged for

---

[2] At that time, the York Defendants were being represented by several attorneys from Saxton & Stump and an attorney from Littler Mendelson P.C.  This representation continued until January 29, 2021, when the attorneys hired by GTL entered their appearances.

former YCP warden Clair Doll ("Warden Doll") and CEO of Smart

Communications, Mr. Logan to directly communicate to discuss settlement.  (*Id.* ¶

34–35.)

   According to the complaint, during Mr. Logan and Warden Doll's first

day of settlement discussions in the patent litigation on August 25, 2020, "Smart

Communications learned that YCP's [inmate calling services, ("ICS")] contract

with GTL would expire in December of 2020 and became aware of the financial

terms of that contract."  (*Id.* ¶ 36.)  Notably, GTL (and its predecessor company)

has been contracted to provide ICS to YCP since 2003.  (*Id.* ¶ 22.)  The following

day, Mr. Logan forwarded Warden Doll marketing materials highlighting

Plaintiffs' various inmate communication technologies services and options and

Warden Doll scheduled a call with Mr. Logan for the following day to discuss

Smart Communications' services in more detail.  (*Id.* ¶¶ 37–38.)  During the next

call, Warden Doll invited Mr. Logan to meet with him and his team at YCP to

discuss "a resolution of the Patent Litigation and to have Smart Communications

present to the YCP team an overview of Smart Communications' inmate

communication services included in the marketing materials, including Smart

Communications' telephone system and services."  (*Id.* ¶ 39.)

  Over the next several months, while the patent litigation was stayed pending

settlement negotiations, Mr. Logan and Warden Doll engaged in extensive contract

negotiations for Smart Communications to provide ICS to YCP. (*See id.* ¶¶ 40–60.) Not surprisingly, these contract negotiations garnered the attention of the current contractor for ICS services, GTL. (*See id.* ¶¶ 61–71.) As a result, GTL engaged in contract extension discussions with YCP. (*Id.* ¶¶ 66–67.) Plaintiffs further allege that during these discussions, GTL made false and detrimental statements about Smart Communications in an effort to convince YCP not to contract with Plaintiffs. (*Id.* ¶¶ 68–70.)

On November 5, 2020, counsel for Plaintiffs contacted then-counsel for the York Defendants "to discuss the upcoming deadline for the parties to report to the Court on the progress towards settlement as required by the terms of the stay that had been entered. York Defendants' then-Patent Litigation counsel indicated that the York Defendants were still moving towards accepting Smart Communications' contract proposal" for ICS. (*Id.* ¶ 75.) Then, "[b]ased on assurances from York Defendants' Patent Litigation counsel of record, on November 13, 2020, Smart Communications agreed to join the York Defendants in representing to the Court presiding over the Patent Litigation that '[t]he parties have engaged and continue to engage in good-faith settlement discussions aimed at resolving this action and reaching a resolution of their dispute.'" (*Id.* ¶ 78.)

Ultimately, YCP did not enter an ICS contract with Smart Communications and instead entered into a new ICS contract with GTL ("YCP-GTL contract") that

contained an indemnification agreement in which GTL agreed to pay attorneys' fees already incurred in the patent litigation; pay attorney's fees and costs incurred to litigate the case to judgment; indemnify the York Defendants for all claims, actions, suits, financial judgment, liability, losses, costs, expenses or damages incurrent as a result of the patent litigation; indemnify the York Defendants for all claims of tortious interference; and control the patent litigation, including selection of counsel and determining which arguments to advance in the litigation. (*Id.* ¶¶ 114–116.) GTL's attorneys from Sterne Kessler entered their appearance in the patent litigation on behalf of the York Defendants on January 29, 2021. (*Id.* ¶¶ 88–94.) Existing counsel for the York Defendants withdrew their appearances the same day.

Eight and one-half months later, on October 6, 2021, Plaintiffs filed the instant complaint, naming the York Defendants and GTL in this antitrust litigation. (Doc. 1.) The YCP-GTL contract forms the basis for the maintenance and champerty[3] claim. (*Id.* ¶¶ 170–173.) Four and one-half months later, on February 23, 2022, Plaintiffs filed a motion for preliminary injunction on the basis of the maintenance claim. (Docs. 62, 63.) The York Defendants and GTL separately filed briefs in opposition on March 9, 2022. (Docs. 67, 68.) Plaintiffs filed a

---

[3] Plaintiffs concede that they have not stated a claim for champerty. (Doc. 51, p. 50.) As a result, the court only refers to Plaintiffs' maintenance claim.

consolidated reply brief, addressing arguments raised by all defendants, on March 23, 2022.  (Doc. 74.)  Thus, this motion is ripe for review.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  The court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367. Further, venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 allows a district court to enter a preliminary injunction.  To obtain a preliminary injunction, plaintiffs must establish: (1) that they are likely to prevail on the merits of the case; (2) that they would suffer irreparable harm if preliminary injunctive relief were denied; (3) that the harm defendants would suffer from the issuance of an injunction would not outweigh the harm plaintiffs would suffer if an injunction were denied; and (4) that the public interest weighs in favor of granting the injunction.  *Holland v. Rosen*, 895 F.3d 272, 285–86 (3d Cir. 2018) (citing *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015)).  The first two factors are "gateway factors": if the plaintiffs have not established those factors, the court need not consider the last two factors.  *Greater Phila. Chamber of Commerce v. City of*

*Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)).  If the plaintiffs do establish the first two factors, "[t]he court then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'"  *Id.* (quoting *Reilly*, 858 F.3d at 179).

A party seeking mandatory injunctive relief that would alter, rather than preserve, the status quo, "must meet a higher standard of showing irreparable harm in the absence of an injunction."  *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).  To obtain a mandatory injunction, the party seeking a mandatory injunction must show that its right to relief is "indisputably clear."  *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quoting *Trinity Indus., Inc. v. Chi. Bd. & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

A preliminary injunction is "an extraordinary remedy never awarded as of right."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Thus, a preliminary injunction should only be awarded in the "limited circumstances" where "the movant, by a clear showing, carries the burden of persuasion."  *Holland*, 895 F.3d at 285. Ultimately, the decision of whether to issue a preliminary injunction is left to the

sound discretion of the district court. *Pennsylvania v. President of United States*, 930 F.3d 543, 565 (2019) (citing *Winter*, 555 U.S. at 24).

DISCUSSION

**A. Likelihood of Success on the Merits**

Because Plaintiffs concede that they have not stated a claim for champerty, the court need only address likelihood of success on the merits of the maintenance claim. At the outset, however, the court notes that there is a dispute between the parties as to whether maintenance exists as an affirmative cause of action under Pennsylvania law. Defendants argue that Plaintiffs did not cite any cases in which Pennsylvania courts recognized maintenance as a cause of action. (Doc. 67, p. 6; Doc. 68, p. 6.)[4]

Upon careful review of this threshold issue, the court disagrees with Defendants. In one of the cases cited in Plaintiffs' brief in support, the Commonwealth Court affirmed the trial court's order granting summary judgment on the champerty and maintenance claim. *Westmoreland Cnty. v. Rta Grp.*, 767 A.2d 1144, 1148 (Pa. Commw. Ct. 2001). Champerty and maintenance are generally plead together, as champerty is a specific type of maintenance. *Allied Med. Assocs. v. State Farm Mut. Auto. Ins. Co.*, No. 08-02434, 2008 U.S. Dist. LEXIS 101659, at *9 n.7 (E.D. Pa. Oct. 30, 2008). Thus, while Plaintiffs concede

---

[4] For ease of reference, the court utilizes the page numbers in the CM/ECF header.

they have not adequately pleaded a claim for champerty, the Commonwealth Court's holding in *Rta Grp.* affirming summary judgment on an affirmatively plead champerty claim–which is a specific type of maintenance claim–persuades the court that there is at least a possibility that Pennsylvania courts recognize that maintenance can be maintained as an affirmative cause of action.

Furthermore, while there is some support for Defendants' argument that champerty and maintenance are outdated and have been subsumed by other tort claims, namely tortious interference with business relationships, not all Pennsylvania courts take this view. *See WFIC, LLC v. Labarre*, 148 A.3d 812, 818 (Pa. Super. 2016) (court sua sponte finding agreement to be champertous). Therefore, for purposes of the instant motion, the court finds that there is sufficient evidence that maintenance exists as an affirmative cause of action under Pennsylvania law to proceed with the analysis of Plaintiffs' likelihood of success on the merits on this claim.

Maintenance is defined as "[a]n officious intermeddling in a lawsuit by a non-party by maintaining, supporting, or assisting either party, with money or otherwise, to prosecute or defend the litigation." *Clark v. Cambria Cnty. Bd. of Assessment Appeals*, 747 A.2d 1242, 1244 n.4 (Pa. Commw. Ct. 2000). "Officious intermeddling" is defined as "meddling with the affairs of others where such involvement is neither asked nor needed." *Allied Med. Assocs.*, 2008 U.S. Dist.

LEXIS 101659 at *31.  Additionally, a plaintiff must allege "malicious, dangerous, or illegal intermeddling with other parties' litigation" to support a claim of maintenance.  *Gould v. Brock*, 69 A. 1122, 1122 (Pa. 1908).

Both parties present compelling arguments with respect to likelihood of success on the merits on the maintenance claim.  Plaintiffs argue that an examination of the YCP-GTL contract clearly demonstrates that GTL is illegally maintaining the patent lawsuit on behalf of the York Defendants, as GTL is not a party to the patent lawsuit and has no legitimate interest in the litigation, which concerns mail service provided by a different vendor, yet GTL entered into an agreement to fund and direct the York Defendants' defense.  (Doc. 63, pp. 10–12.)  In contrast, the York Defendants and GTL argue that GTL has an immediate stake in the outcome of the patent litigation and that GTL is contractually obligated to defend and indemnify the York Defendants, which means that GTL cannot be liable for maintenance.  (Doc. 67, pp. 12–15; Doc. 68, pp. 7–16.)  GTL and the York Defendants also argue that GTL is not a disinterested third party, as Plaintiffs brought the patent lawsuit against the York Defendants and then utilized the settlement negotiations in that case to attempt to unseat GTL as the ICS provider for YCP.  (Doc. 67, p. 15; Doc. 68, p. 11.)

The context in which GTL developed an interest in the patent lawsuit cannot be ignored.  Plaintiffs initiated the patent lawsuit against the York Defendants

based on alleged infringement of Plaintiffs' patent for an inmate mail processing machine.  Without suggesting that the patent lawsuit was not filed in good faith, it is apparent that Plaintiffs attempted to leverage their patent lawsuit into a business negotiation for an ICS contract with YCP, which is a different line of business than the mail sorting technology at issue in the patent lawsuit.[5]  Without suggesting any impropriety in that business action, the court notes that it was Plaintiffs' decision to convert the patent lawsuit settlement negotiation into a business pitch to provide ICS for YCP that piqued the interest of YCP's ICP provider at the time—GTL. Therefore, to the extent that GTL *may* have "meddled" in the patent lawsuit, the court cannot overlook that Plaintiffs were courting YCP's ICS business through the patent lawsuit negotiations, despite knowing of YCP's prior engagement with GTL.  Effectively, Plaintiffs' business decision baited GTL into forming an interest in the patent litigation where GTL would otherwise have had no interest.  It should come as no surprise to Plaintiffs that GTL, who was then engaged in a business relationship with YCP for the provision of ICS, sought to protect its business relationship.

---

[5] One need look no further than Plaintiffs' own complaint in this case to see that during "settlement negotiations" for the patent litigation, Plaintiffs and YCP did little more than discuss an entirely unrelated ICS contract between Smart Communications and YCP.  *See* Doc. 1, ¶¶ 36–71, 75, 78.

Against this contextual backdrop, the court finds it unclear whether GTL in fact had a "legitimate interest" in the lawsuit sufficient to preclude a finding that GTL engaged in maintenance.  By contrast, the court can easily imagine a scenario, with only one factual difference from the above, in which there would be a clear likelihood of success on the merits of Plaintiffs' maintenance claim. Imagine that the settlement talks between Plaintiffs and YCP were strictly limited to the alleged injury in the patent case involving the mail processing technology utilized by YCP, rather than a business pitch to enter into an ICS contract.  In that circumstance, if GTL entered into a contract with YCP in which it agreed to indemnify and defend the York Defendants in the patent litigation, then Plaintiffs' maintenance claim would be quite clear-cut.  In that circumstance, the court would have no trouble finding that Plaintiffs sufficiently alleged a likelihood of success on the merits.

However, having considered all of these arguments and the relevant contextual backdrop that actually occurred, the court concludes that Plaintiffs' likelihood of success on the merits of the maintenance claim is a close call. However, the court will not make the call in this case because the court concludes that Plaintiffs have not come close to satisfying the second factor—irreparable harm.

**B. Irreparable Harm**

To allege irreparable harm, Plaintiffs "must demonstrate potential harm
which cannot be redressed by a legal or equitable remedy following a trial."
*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).
Further, because Plaintiffs are seeking mandatory injunctive relief, they "must
meet a higher standard of showing irreparable harm in the absence of an
injunction." *Bennington Foods LLC*, 528 F.2d at 179.  Plaintiffs must demonstrate
that their right to relief is "indisputably clear."  *Hope*, 972 F.3d at 320 (3d Cir.
2020).  Additionally, the Third Circuit has stated that "a showing of irreparable
harm is insufficient if the harm will occur only in the indefinite future.  Rather, the
moving party must make a clear showing of immediate irreparable harm."
*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in
original).

Plaintiffs argue that the peculiar ongoing harm to them is in being forced to
litigate a case against GTL, which lacks the incentives of a normal litigant and is
only seeking to financially burden and punish its business rival with amplified
legal expenses caused by prolonging and multiplying the litigation.  (Doc. 63, p.
20.)  They assert that it would be difficult, if not impossible, to calculate the
difference between what Plaintiffs paid to litigate the case against GTL versus

what they would have paid to litigate the case against the York Defendants, had they funded and controlled their own defense. (Doc. 63, p. 20 n.4.)

In response, Defendants first argue that the harm Plaintiffs are asserting is speculative and factually unsupported. (Doc. 67, p. 16; Doc. 68, p. 17.) On this point, Defendants argue that Plaintiffs have not provided anything beyond conjecture that GTL funding and controlling the patent litigation on behalf of the York Defendants will prolong or change the nature of the litigation, or that GTL will be less motivated to settle the case. (Doc. 67, pp. 17–18; Doc. 68, pp. 17–19.) Additionally, GTL asserts that if increased litigation expenses are eventually proven, this harm could be compensated by monetary damages and is thus not irreparable. (Doc. 67, p. 17; Doc. 68, p. 18.)

In their reply brief, Plaintiffs argue that while courts are split over whether litigation costs alone establish irreparable harm, most seem to find that wasteful, unrecoverable, and possibly duplicative costs are proper considerations to be balanced among others. (Doc. 74, p. 7.) However, upon review of the case cited by Plaintiffs on this point, the court notes that the analysis appears to focus on stays pending an interlocutory appear under Rule 23(f). *See Huffman v. Prudential Ins. Co. of Am.*, No. 2:10-CV-05135, 2018 U.S. Dist. LEXIS 40400, at *8 (E.D. Pa. Mar. 12, 2018) (Plaintiff argued that without a stay, it would incur the significant costs of conducting class discovery that would become moot if the

Third Circuit reversed the decision to certify the class, but the court ultimately found that denial of a stay would not pose irreparable harm and denied the request for a stay, using the same factors used for analysis of a preliminary injunction) (citing *Ewing Indus. Corp. v. Bob Wines Nursery*, No. 3:13-CV-931, 2015 U.S. Dist. LEXIS 192147, at *7 (M.D. Fla. Feb. 5, 2015) ("courts balancing the factors in the contexts of stays during the pendency of Rule 23(f) petitions have found that wasteful, unrecoverable, and possibly duplicative costs are proper considerations")).

Here, we are not faced with a situation in which Plaintiffs would be forced to expend money and effort to litigate a case that may be moot upon a reversal by the Third Circuit. Rather, Plaintiffs' argument is that they *may* be forced to expend *more* money and effort to litigate a case being funded by GTL than they would have if they were litigating the case and it was funded by the York Defendants themselves. The Supreme Court has held that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). Moreover, demonstrating that a harm cannot be compensated by money damages "is not an easy burden." *Adams v. Freedom Forge Corp*, 204 F.3d 475, 484–85 (3d Cir. 2000). As previously noted, there is a higher standard of demonstrating irreparable harm where mandatory injunctive relief is requested. *Bennington Foods LLC*, 528

15

F.3d at 179.  Plaintiffs have not met that burden here, where they have neither alleged facts to support their speculative proposition that their litigation expenses would be drastically increased, nor have they demonstrated that this alleged harm could not be compensated by money damages.

Furthermore, and most importantly in the view of the court, Defendants argue that Plaintiffs' delay in seeking injunctive relief is a sufficient basis to deny Plaintiffs' motion.  (Doc. 67, pp. 18–19; Doc. 68, pp. 19–20.)  Defendants cite several cases in which unexplained delay for several months or more was found to be a sufficient basis to deny a request for preliminary injunction.  *See Rogers v. Gentex Corp.*, 2016 WL 4708004 at *14 n.2 (M.D. Pa. Sep. 8, 2016) (holding that a six-month delay between filing the complaint and the motion for preliminary injunction weighed against a finding of irreparable harm); *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (noting an unexplained delay of two months in presenting a cease-and-desist letter and an unexplained delay of five months in moving for injunctive relief, the court held that plaintiffs' delay alone precluded a finding of irreparable harm and warranted denial of the request for preliminary injunction); *Skehan v. Bd. of Trustees of Bloomsburg St. College*, 353 F. Supp. 542, 543 (M.D. Pa. 1973) (holding that delays in seeking injunctive relief have been held grounds for barring that relief because an application for a preliminary injunction is based upon an urgent need

for the protection of the plaintiff's rights and a long delay indicates that speedy action is not required).

Research revealed additional cases in which Courts of Appeals have held that a lengthy, unexplained delay was a sufficient ground upon which to deny a request for preliminary injunction.  *See Lanin v. Borough of Tenafly*, 515 Fed. Appx. 114, 117–18 (3d Cir. 2013) (affirming the District Court's finding that a two-year delay in seeking a preliminary injunction was sufficient proof that there was no risk of immediate, irreparable harm); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (vacating the District Court's order granting the preliminary injunction, in part due to the District Court failing to consider the ten-week delay in seeking a preliminary injunction, which "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.")

Here, the undisputed facts demonstrate that GTL's attorneys replaced counsel of record for the York Defendants on January 29, 2021, and assumed responsibility for the defense as of that date.  The antitrust complaint containing the maintenance claim in the instant case was filed on October 16, 2021. Plaintiffs' motion for preliminary injunction wasn't filed until February 23, 2022. Thus, there was a delay of almost nine months in bringing this lawsuit and a delay of almost 13 months from the underlying conduct before the request for injunctive

relief was made.  While Plaintiffs' reply brief argues that the cases cited by

Defendants involving delay are distinguishable, notably absent from the reply brief

is any explanation for the delay.

Where there is a legitimate reason for a delay, such delay may not preclude a

finding of irreparable harm.  *See, e.g., BP Chems. Ltd. v. Formosa Chem. & Fibre

Corp.*, 229 F.3d 254, 264 (3d Cir. 2000) ("To the extent that delay can justify

denial of a motion for a preliminary injunction, a delay caused by plaintiff's good

faith efforts to investigate an infringement or to determine how serious an

infringement is does not preclude a finding of irreparable harm"); *Gidatex, S.r.L. v.

Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 420 (S.D.N.Y. 1998) (holding that

even if three of the eight months involved excusable delay, the delay precluded a

finding of irreparable harm because the information giving rise to the claim was

already known to plaintiff); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir.

1992) (eight-month delay did not preclude preliminary injunctive relief where

plaintiff used that period to investigate defendant's acts and to inform defendant of

his objections).

Plaintiffs have proffered <u>no</u> excuse for the lengthy delay in this case.  At the

very least, the information giving rise to the claim was known to Plaintiffs at the

time the antitrust complaint was filed because most of the facts alleged in support

of the motion for preliminary injunction are alleged in the complaint.  Even if the

almost nine-month delay in bringing the complaint were attributable to Plaintiffs investigating the specifics of the YCP-GTL contract, the additional four-month delay between the filing of the complaint and the motion for preliminary injunction remains unexplained.  Faced with at least four, if not thirteen, months of unexplained delay, and because "[d]elay in seeking enforcement of [Plaintiffs'] rights [. . .] tends to indicate a reduced need for such drastic, speedy action," *Lanin*, 515 Fed. Appx. at 117, the court finds that Plaintiffs' claim of irreparable injury is belied by their own dilatory behavior.  This behavior is consistent with the hypothesis, supported by the complaint, that Plaintiffs are less concerned with the increased cost of litigating the patent case against GTL and more concerned with decreasing GTL's market share.[6]

Plaintiffs' alleged harm is speculative, they have not demonstrated that it would be irreparable, and their significant delay in requesting relief contradicts the claim that the harm is immediate.  Thus, they have failed to show that they would

---

[6] In the complaint, Plaintiffs note that GTL holds approximately 81% of the ICS market in Pennsylvania's county correctional facilities, approximately 80% of the ICS market in Pennsylvania's federal prisons, and an estimated 51.38% of the ICS telephone market in Pennsylvania.  (Doc. 1, ¶ 125.)  Further, Plaintiffs note that GTL and another company, Securus Technologies, LLC, account for at least 80% of the telephone calls placed by inmates in correctional facilities around the country.  (*Id.* ¶ 126.)  It is apparent that Plaintiffs utilized settlement negotiations in the patent litigation, relating to mail scanning services, to unseat GTL as the ICS provider for YCP.  Likewise, it is apparent that Plaintiffs believe that, absent GTL's actions and the YCP-GTL contract, YCP would have entered into a contract for ICS with Plaintiffs.  (*Id.* ¶¶ 96–107.)  However, the belated request for injunctive relief prohibiting GTL from continuing to defend and indemnify the York Defendants does not withstand scrutiny.

suffer irreparable harm if the injunction is not granted.  Because Plaintiffs have not satisfied one of the first two gateway factors necessary for the issuance of a preliminary injunction, the court will not examine the remaining factors.  *See Greater Phila. Chamber of Commerce*, 949 F.3d at 133 (holding that only if the movant establishes a likelihood of success on the merits and the existence of irreparable harm should "the district court consider the two remaining factors"). Plaintiffs have not met their heavy burden of demonstrating entitlement to mandatory preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is denied.  An appropriate order follows.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: April 7, 2022