# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SMART COMMUNICATIONS     :    Civil No. 1:21-CV-01708
HOLDING, INC., *et al.*,         :
                             :
        Plaintiffs,       :
                             :
        v.               :
                             :
GLOBAL TEL-LINK CORPORATION, :
*et al.*,                          :
                             :
        Defendants.      :    Judge Jennifer P. Wilson

## <u>MEMORANDUM</u>

This case involves allegations of anticompetitive behavior brought under the Sherman Act, 15 U.S.C. § 1 (against all Defendants), and tortious interference with prospective business relations, unfair competition, and champerty and maintenance against Defendant Global Tel-Link Corp. ("GTL").  (Doc. 1.)  The other Defendants in this case include: York County, Pennsylvania ("York County"), York County Prison ("YCP"), and Mr. Adam Ogle, in his official capacity as acting Warden of YCP ("Warden Ogle") (collectively "the York Defendants").  Presently before the court are two motions to dismiss, one filed by the York Defendants and the other filed by GTL.  (Docs. 28, 29.)   For the reasons that follow, the court will grant Defendants' motions to dismiss.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs Smart Communications Holding, Inc. and HLFIP Holding, Inc., d/b/a Smart Communications IP Holdings (collectively "Plaintiffs") filed a

complaint against GTL and the York Defendants alleging a violation of the

Sherman Act and state-law claims of tortious interference with prospective

business relations, unfair competition, and champerty and maintenance.  (Doc. 1.)

All four counts of the complaint relate, in full or in part, to GTL's conduct in

relation to and during the pendency of the related patent litigation.[1]  (*Id.*)

The related patent litigation was initiated via complaint on February 3, 2020.

(*Id.* ¶ 30.)  The patent action alleged infringement by the York Defendants of

Plaintiffs' MailGuard technology, which involves processing postal mail for

inmates.  (*Id.* ¶¶ 26–30.)  Several months after the patent complaint was filed,

counsel arranged for former YCP warden Clair Doll ("Warden Doll") and the CEO

of Smart Communications, Mr. Logan, to directly communicate to discuss

settlement.  (*Id.* ¶ 34–35.)

According to the complaint in this action, during Mr. Logan and Warden

Doll's first day of settlement discussions in the patent litigation on August 25,

2020, "Smart Communications learned that YCP's [inmate calling services,

("ICS")] contract with GTL would expire in December of 2020 and became aware

of the financial terms of that contract."  (*Id.* ¶ 36.)  Notably, GTL (and its

predecessor company) has been contracted to provide ICS to YCP since 2003.  (*Id.*

¶ 22.)  The following day, Mr. Logan forwarded Warden Doll marketing materials

---

[1] *See HLFIP Holding, Inc. d/b/a/ Smart Communications IP Holdings, v. York County, et al.*, 1:20-CV-00186.

highlighting Plaintiffs' various inmate communication technologies services and options and Warden Doll scheduled a call with Mr. Logan for the following day to discuss Smart Communications' services in more detail. (*Id.* ¶¶ 37–38.) During the next call, Warden Doll invited Mr. Logan to meet with him and his team at YCP to discuss "a resolution of the Patent Litigation and to have Smart Communications present to the YCP team an overview of Smart Communications' inmate communication services included in the marketing materials, including Smart Communications' telephone system and services." (*Id.* ¶ 39.)

Over the next several months, while the patent litigation was stayed pending settlement negotiations, Mr. Logan and Warden Doll engaged in extensive contract negotiations for Smart Communications to provide ICS to YCP. (*See id.* ¶¶ 40–60.) Not surprisingly, these contract negotiations garnered the attention of the current contractor for ICS services, GTL. (*See id.* ¶¶ 61–71.) As a result, GTL engaged in contract discussions with YCP to extend their ICS contract. (*Id.* ¶¶ 66–67.) Plaintiffs further allege that during these discussions, GTL made false and detrimental statements about Smart Communications in an effort to convince YCP not to contract with Plaintiffs. (*Id.* ¶¶ 68–70.)

On November 5, 2020, counsel for Plaintiffs contacted then-counsel for the York Defendants "to discuss the upcoming deadline for the parties to report to the Court on the progress towards settlement as required by the terms of the stay that

had been entered.  York Defendants' then-Patent Litigation counsel indicated that the York Defendants were still moving towards accepting Smart Communications' contract proposal" for ICS.  (*Id.* ¶ 75.)  Then, "[b]ased on assurances from York Defendants' Patent Litigation counsel of record, on November 13, 2020, Smart Communications agreed to join the York Defendants in representing to the Court presiding over the Patent Litigation that '[t]he parties have engaged and continue to engage in good-faith settlement discussions aimed at resolving this action and reaching a resolution of their dispute.'"  (*Id.* ¶ 78.)

Ultimately, YCP did not enter an ICS contract with Smart Communications and instead entered into a new ICS contract with GTL ("YCP-GTL contract") that contained an indemnification agreement in which GTL agreed to pay the York Defendants' attorneys' fees already incurred in the patent litigation; pay the York Defendants' attorney's fees and costs that would be incurred to litigate the case to judgment; indemnify the York Defendants for all claims, actions, suits, financial judgment, liability, losses, costs, expenses or damages incurred as a result of the patent litigation; indemnify the York Defendants for all claims of tortious interference; and control the patent litigation, including selection of counsel and determining which arguments to advance in the litigation.  (*Id.* ¶¶ 114–116.) GTL's attorneys from Sterne Kessler entered their appearance in the patent litigation on behalf of the York Defendants on January 29, 2021.  (*Id.* ¶¶ 88–94.)

Existing counsel for the York Defendants withdrew their appearances the same day.

About eight months later, on October 6, 2021, Plaintiffs filed the instant complaint, naming the York Defendants and GTL in this antitrust lawsuit. (Doc. 1.) On February 23, 2022, Plaintiffs filed a motion for preliminary injunction, seeking to invalidate the indemnification agreement between GTL and the York Defendants in the related patent litigation based on a theory of maintenance. (Doc. 62.) On April 7, 2022, the court denied that motion, finding that Plaintiffs failed to demonstrate that they would suffer irreparable harm if preliminary injunctive relief were denied. (Docs. 77, 78.)

On December 6, 2021, both the York Defendants and GTL filed motions to dismiss. (Docs. 28, 29.) The briefs in support of these motions were filed on December 20, 2021. (Docs. 36, 37.) Plaintiffs timely filed a brief in opposition to the York Defendants' motion on January 14, 2022, and a brief in opposition to GTL's motion on January 27, 2022. (Docs. 47, 51.) The York Defendants and GTL each filed a reply brief on January 28, 2022. (Docs. 52, 53.)

On April 29, 2022, GTL submitted a notice of supplemental authority to notify the court of a recent precedential opinion by the Third Circuit Court of Appeals addressing antitrust standing: *Host Int'l, Inc. v. MarketPlace, PHL, LLC*,

32 F.4th 242 (3d Cir. 2022).  (Doc. 86.)[2]  Upon reviewing this decision, the court

issued an order directing supplemental briefing to address the issue of antitrust

standing, and scheduling oral argument for August 26, 2022.  (Doc. 88.)  In

accordance with that order, GTL and the York Defendants submitted their

supplemental letter briefs on July 6, 2022.  (Docs. 89, 90.)  Plaintiffs then timely

filed their responsive letter brief on July 20, 2022.  Doc. 91.)  Oral argument on

these motions was held on August 26, 2022.  Thus, these motions are ripe for

review.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district

court to exercise subject matter jurisdiction in civil cases arising under the

Constitution, laws, or treaties of the United States.  Moreover, this court has

jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity

between the Plaintiff and Defendant and Plaintiff asserts that the amount in

controversy exceeds $75,000.  The court also has supplemental jurisdiction over

the related state-law claims pursuant to 28 U.S.C. § 1367.  Venue is appropriate

under 28 U.S.C. § 1391.

---

[2] Supplemental authority was also submitted on April 14, 2022 and September 23, 2022.  (Docs. 80, 93.)

**STANDARD OF REVIEW**

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

**DISCUSSION**

**A. Unlawful Exclusive Dealing – Antitrust Claim**

In Count 1 of the complaint, Plaintiffs allege unlawful exclusive dealing in violation of Section 1 of the Sherman Act.  (*See* Doc. 1, ¶¶ 142–156.)  "Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a contract, combination . . .

or conspiracy, in restraint of trade or commerce." *Twombly*, 550 U.S. at 570 (internal quotations omitted).  However, "[i]t is well established that [Section 1 of the Sherman Act] . . . prohibits only 'unreasonable' restraints of trade." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F. 3d 57, 74 (3d Cir. 2010).  Thus, a plaintiff asserting a claim pursuant to Section 1 must adequately plead "four elements: (1) a concerted action by defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that plaintiff was injured as a proximate result of the concerted action." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l*, 602 F.3d 237, 253 (3d Cir. 2010).

Furthermore, the legality of an exclusive dealing arrangement is judged under the rule of reason, and "depends on whether [the exclusive dealing arrangement] will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 251, 271 (3d Cir. 2012).  In other words, an exclusive dealing arrangement is only unlawful if the effect of such arrangement is to substantially lessen competition, as opposed to merely disadvantaging rivals. *Id.*  Further, total foreclosure of the market is not required, rather, the challenged arrangement must bar a substantial number of rivals or severely restrict the market's ambit. *Id.*

Defendants have raised several arguments in support of their motions to dismiss this count.  The court will address the arguments seriatim.

### 1.  Failure to State a Claim

Defendants raise several arguments relating Plaintiffs' failure to state a claim under Section 1 of the Sherman Act.  The court will begin with Defendants' argument that Plaintiffs have failed to allege an unreasonable restraint on trade because they have failed to state a cognizable geographic market or substantial market foreclosure.  (Doc. 37, pp. 17–18.)[3]

First, as to the geographic market, it is well established that "the relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Deborah Heart and Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 404 (3d Cir. 2016).  GTL argues that YCP cannot, by itself, be the relevant geographic market for purposes of a Section 1 claim, especially where, as here, YCP is the buyer, and Plaintiffs have alleged in the complaint that they and GTL provide ICS "throughout the United States."  (Doc. 37, p. 18) (quoting Doc. 1, ¶ 155.)  Because GTL maintains that the relevant geographic market should be the nationwide market for ICS, it contends that the complaint does not adequately plead substantial foreclosure of that market.  (Doc. 37, pp. 17–18.)

---

[3] For ease of reference, the court utilizes the page numbers in the CM/ECF header.

In opposition, Plaintiffs argue that under certain unique circumstances, a single facility can be treated as the relevant market, and that the inmates of YCP are ultimately the buyers at issue in this case, not YCP itself.  (Doc. 51, pp. 14–15.)  Plaintiffs reason that because inmates cannot look anywhere outside the walls of YCP for ICS, YCP is therefore the relevant market.  (*Id.* at 15.)  Furthermore, Plaintiffs assert that dismissal based on market definition is disfavored.  (*Id.* at 15–16.)  During oral argument, when questioned about the propriety of YCP as the relevant geographic market, Plaintiffs indicated that based on the allegations in the complaint, GTL has significant market power in almost every conceivable market, no matter how the relevant geographic market is defined.  (Doc. 94, pp. 61–63.)

The complaint in this case explicitly asserts that YCP is the relevant geographic market.  (Doc. 1, ¶ 122.)  However, the complaint provides the following statistics regarding GTL's market power and alleged market foreclosure:

> 125. GTL also has significant market power in the ICS market within the State of Pennsylvania.  While GTL does not provide ICS to any state correctional institutions in Pennsylvania, upon information and belief, GTL holds approximately 81% of the ICS market in Pennsylvania's federal prisons.  As a result, GTL possesses an estimated 51.38% of the ICS telephone market in Pennsylvania.
>
> 126. Nationally, GTL and another company, Securus Technologies, LLC, dominate the market for ICS.  Together, the two companies account for at least 80% of the telephone calls placed by inmates in correctional facilities around the country.

(*Id.* ¶¶ 125–126.)

10

Additionally, as noted by GTL, the complaint concedes that there is a nationwide ICS market in which Plaintiffs and GTL both compete:

> 155. Defendants' illegal restraint on trade affects interstate commerce because in selecting an ICS provider, *York County enters into the national market to contract with businesses like GTL and Smart Communications*, which are based outside of Pennsylvania and engage in commercial activity, including the supply of ICS, *throughout the United States*.

(*Id.* ¶ 155) (emphasis added).

The court agrees with GTL that even under the unique circumstances present in the prison context, YCP cannot, by itself, constitute the relevant geographic market. The Third Circuit has repeatedly expressed reluctance to accept a single facility, such as a hospital, as the relevant geographic market. *See Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877–878 (3d Cir. 1995) (collecting cases). Furthermore, acknowledging Plaintiffs' argument that the inmates at YCP cannot look outside of the prison walls for ICS, the court notes that the relevant market is not defined by the point of view of the inmates where the cause of action is brought by a competitor, and not the inmates. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 147–148 (3d Cir. 2001) (in a challenge to a corporate sale that prevented employees from working at AT&T, the court held that the relevant geographic market includes all technology companies that competed for employees with the skills and training possessed by plaintiffs, and was not limited to AT&T); *see also Rockland Physician Associates, P.C. v. Grodin*, 616 F. Supp. 945, 955 (S.D.N.Y.

1985) (holding that "a single hospital may constitute the relevant market from the point of view of patients, yet not constitute the market for the purpose of analyzing the claims of providers of services") (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984)). Additionally, it is significant that the complaint plainly states that York County entered into the *national* ICS market to contract with businesses such as GTL and Smart Communications. Therefore, the court finds the relevant geographic market in this case must be the nationwide ICS market.

Having determined the relevant geographic market, the court turns to the rule of reason test and the issue of substantial market foreclosure. The complaint contains one allegation relating to alleged foreclosure of the nationwide ICS market: "GTL and another company, Securus Technologies, LLC, dominate the market for ICS. Together, the two companies account for at least 80% of the telephone calls placed by inmates in correctional facilities around the country." (Doc. 1, ¶ 126.) However, this falls short of alleging substantial foreclosure of the nationwide market. In part, that is because Securus is not a defendant in this action. Yet, this allegation provides no indication of the portion of the nationwide market held by GTL versus Securus. In addition, the allegation does not identify the number of contracts held by either company; rather, it merely notes that the two companies "account for" a high percentage of the calls "placed by inmates in

12

correctional facilities around the country." Without more explanation, this allegation leaves open the possibility that GTL and Securus have ICS contracts at more populous prisons than their competitors. This allegation does not come close to stating the portion of the nationwide market of ICS contracts held by GTL.

Therefore, this sole allegation in the complaint does not contain sufficient factual content that would allow the court to draw the reasonable inference that there was substantial foreclosure of the relevant nationwide ICS market or that the challenged agreement barred a substantial number of rivals or severely restricted the market's ambit. *See ZF Meritor*, 696 F.3d at 271. Thus, Plaintiffs have failed to state a claim upon which relief can be granted, and Defendants' motions will be granted as to Count 1.

### 2. Antitrust Standing

In addition to the statutory language of Section 1 of the Sherman Act, antitrust claims are subject to an additional requirement known as "antitrust standing." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248–49 (3d Cir. 2022). This is a concept entirely distinct from Article III standing, and is a judicially-imposed requirement. *Id.* at 249. Thus, even if a plaintiff has Article III standing, courts must also consider "whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). Over time, courts have developed the

following exhaustive list of factors to determine whether a plaintiff is properly

pursuing an antitrust action:

(1) [T]he causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;

(2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;

(3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

(4) the existence of more direct victims of the alleged antitrust violations; and

(5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–65 (3d Cir.

1993) (citing *ACG*, 459 U.S. at 545).

The second factor—antitrust injury—"is a necessary condition of antitrust

standing and if it is lacking, a court need not address the remaining factors." *Host*

*Int'l*, 32 F.4th at 249.  Thus, courts often begin the inquiry with this threshold

factor, looking for "an injury of the type the antitrust laws were intended to prevent

and that flows from that which makes defendant's acts unlawful." *Id.* (internal

quotations omitted).  This means that the "challenged conduct affected the prices,

quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Id.*

at 250.  This comports with the principle that lies at the heart of antitrust laws: to

protect competition, not competitors. *Phila. Taxi Ass'n v. Uber Techs.*, 886 F.3d 332, 338 (3d Cir. 2018).  Thus, courts will find a violation of antitrust laws "only when [challenged conduct] harms the market, and thereby harms the consumer." *Id.*

At oral argument, Plaintiffs asserted that their antitrust injury was *not*, as alleged by Defendants, the failure to obtain the ICS contract with YCP; rather, Plaintiffs assert that their injury relates to "the [YCP-GTL contract], and its extension of the foreclosure of the market at rates that were below what they could have had." (Doc. 94, p. 77.)  Plaintiffs pointed to three specific provisions in the YCP-GTL contract that allegedly demonstrate antitrust injury: the extension of the length from two to five years with two one-year options; a termination penalty; and an indemnification agreement.  (*Id.* at 52–53.)

Having considered the parties' respective arguments, the court finds no antitrust injury here.  While the court acknowledges some factual distinctions between *Host Int'l* and the case at hand, there are significant similarities.  In *Host Int'l*, after a competitive bidding process, Host won two concession spots at Philadelphia International Airport ("PHL"), planning to open a coffee shop in one and a restaurant in the other.  *Host Int'l*, 32 F.4th at 247.  Negotiations between Host and MarketPlace, the private firm that was a landlord for PHL, hit a wall when MarketPlace insisted on a term allowing it to enter into certain agreements

15

granting third parties exclusive or semi-exclusive rights to be the sole providers of certain foods, beverages, or other products. *Id.* This included a pouring-rights agreement (PRA) granting PepsiCo. exclusive control over all beverages advertised, sold, and served at PHL. *Id.* Host demanded that the PRA be excluded from the lease agreement, and walked away from the lease negotiations when MarketPlace refused. *Id.* Subsequently, Host sued, alleging, *inter alia*, an illegal conspiracy and agreement in restraint of trade, in violation of Section 1 of the Sherman Act. *Id.* The District Court granted MarketPlace's motion to dismiss finding that Host failed to adequately plead a relevant geographic market. Host then timely appealed to the Third Circuit Court of Appeals. *Id.*

On appeal, the Third Circuit first examined whether Host had antitrust standing. *Id.* at 248. The court held that exclusion from PHL was not a sufficient antitrust injury because Host walked away from negotiations and a breakdown in contract negotiations is outside the scope of the Sherman Act. Additionally, the court held that Host was seeking a remedy for injury to itself, which is not an antitrust injury. *Id.* at 251. Host failed to plead facts tending to show that consumer prices would increase under the PRA. Furthermore, the court held that Host's complaint lacked any facts alleging harm to other PHL tenants, and potential harms do not suffice. *Id.* The doctrine of antitrust injury "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to

consumers" in the relevant market. *Id.* at 252. In conducting this analysis, courts are cautioned to avoid the "siren songs of illusory harm." *Id.*

Here, looking at Plaintiffs' asserted injury—the three additional terms in the YCP-GTL contract—this court finds nothing more than an allegation of harm to Plaintiffs and potential and illusory harm to others. The court observes that Plaintiffs do assert that the price per call for YCP inmates under the YCP-GTL contract is higher than it would have been if YCP contracted with Smart Communications. (Doc. 1, ¶ 100.) While this allegation is important, it does not end the inquiry. It is here that the court must take note of the factual background of this case and the context in which the contract negotiations began and ended between Plaintiffs and the York Defendants.

Plaintiffs initiated the patent lawsuit against the York Defendants based on alleged infringement of Plaintiffs' patent for an inmate mail processing machine. Without suggesting that the patent lawsuit was not filed in good faith, it is apparent that Plaintiffs attempted to leverage their patent lawsuit into a business negotiation for an ICS contract with YCP, which is a different line of business than the mail sorting technology at issue in the patent lawsuit.[4] Without suggesting any

---

[4] One need look no further than Plaintiffs' own complaint in this case to see that during "settlement negotiations" for the patent litigation, Plaintiffs and YCP did little more than discuss the entirely unrelated potential ICS contract between Smart Communications and YCP. *See* Doc. 1, ¶¶ 36–71, 75, 78.

impropriety in that business action, the court notes that it was Plaintiffs' decision to convert the patent lawsuit settlement negotiation into a business pitch to provide ICS for YCP.  And it was Plaintiffs' business pitch that piqued the interest of YCP's current and long-time ICS provider—GTL.

The fact that Plaintiffs were courting YCP's ICS business through the patent lawsuit negotiations, despite knowing of YCP's prior and ongoing business relationship with GTL, is relevant to assessing the alleged injury to Plaintiffs and the price per call paid by YCP inmates.  Effectively, Plaintiffs' business decision baited GTL into forming an interest in the patent litigation and altering its strategy for negotiations with YCP in order to renew their ICS contract with YCP.  This factual context for GTL renewing their contract with YCP establishes that this was not a situation in which the York Defendants opened a competitive bidding process for all ICS providers to compete for the upcoming ICS contract and GTL suddenly added additional terms in an effort to foreclose all competition.

At oral argument, Plaintiffs asserted that the YCP-GTL contract is a losing contract for everyone but GTL.  (Doc. 94, p. 76.)  Plaintiffs stated that the inmates lost because they are paying more per call under the YCP-GTL contract that they would have under the proposed contract between Plaintiffs and YCP, and York County lost because it forfeited an additional million dollars that it would have received under Plaintiffs' proposed contract.  (*Id.*)  However, these assertions

overlook the crucial factual background here: namely, that during the contract

negotiations, the York Defendants were facing a patent infringement lawsuit

brought by Plaintiffs.  One of the terms in the YCP-GTL contract—which

Plaintiffs assert is anti-competitive—is an indemnification provision providing that

GTL would indemnify the York Defendants for all claims, actions, suits, financial

judgment, liability, losses, costs, expenses or damages incurrent as a result of the

patent litigation.  (Doc. 1, ¶ 114.)  It is reasonable to infer that the potential

financial impact of the pending patent lawsuit was a strong financial consideration

for the York Defendants during the ICS contract negotiations with both ICS

providers, in addition to the cost per call and the additional money YCP would be

entitled to under each contract.  Bearing in mind this context, which is detailed in

the complaint, the court is unable to conclude that Plaintiffs adequately plead harm

to *competition*, as opposed to harm merely to their own welfare.  In other words,

Plaintiffs are clearly seeking to remedy their alleged harm from their loss of their

attempt to leverage the ICS contract with YCP; but it is not clear that Plaintiffs are

seeking to remedy harm to market competition.

Antitrust laws are intended to protect competition, not competitors.  *Phila*

*Taxi Ass'n*, 886 F.3d at 338.  Injuries that antitrust laws are intended to prevent are

those that harm the market, and thereby harm the consumer.  *Id.*  Having

determined that the relevant market here is the nationwide ICS market, the

allegations and factual background set forth in the complaint do not plausibly allege that the nationwide ICS market, and thereby consumers within that market, have been harmed by the YCP-GTL contract.  In short, no antitrust injury has been alleged and Plaintiffs have therefore failed to demonstrate that they have antitrust standing.

Having found that Count 1 will be dismissed due to failure to state a claim and lack of antitrust standing, the court will now return to the various immunity arguments to determine whether the claim will be dismissed with or without prejudice.

### 3. *Parker* Immunity

The state action doctrine, set forth by the United States Supreme Court, protects states, officers, and agents from antitrust liability when their actions were directed by the state legislature.  *Parker v. Brown*, 317 U.S. 341, 350–51 (1943) ("We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restraint a state of its officers or agents from activities directed by its legislature.")  This has become known as *Parker* immunity.  *Parker* immunity protects local governments from antitrust liability when they act "pursuant to a clearly articulated and affirmatively expressed state policy to displace competition." *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 (2013).

The legislation enabling a municipality's actions need not explicitly authorize activity with anticompetitive effects to satisfy the clear-articulation test; the legislation need only authorize activity that "foreseeably will result in anticompetitive effects." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 43 (1985).   Displacement of competition is foreseeable when it is "the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *Phoebe Putney*, 568 U.S. at 229.   "Where a state delegates generic contracting powers, the clear-articulation test is not met." *Edinboro Coll. Park Apts. v. Edinboro Univ. Found.*, 850 F.3d 567, 580 (3d Cir. 2017).

The party asserting *Parker* immunity carries the burden of proving that it applies. *Yeager's Fuel, Inc. v. Penn. Power & Light Co.*, 22 F.3d 1260, 1266 (3d Cir. 1994).   Additionally, a private party's conduct may likewise be immune from liability where the state: "(1) has articulated a clear and affirmative policy to allow the anticompetitive conduct, and (2) provides active supervision of anticompetitive conduct undertaken by private actors." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 629 (1992).

The York Defendants argue that they are entitled to *Parker* immunity here because they were acting pursuant to a clearly expressed state policy.  (Doc. 36, pp. 7–11.)  In support of their argument, the York Defendants provide citations to various statutory provisions.  (*Id.*)  First, the York Defendants assert that the

administration of county prisons in Pennsylvania is governed by the County Code and statutes relating to prisons and parole, generally citing 16 P.S. §§ 101, *et seq.* and 61 Pa. C.S. §§ 1721, *et seq.* (Doc. 36, p. 8.)  Next, the York Defendants cite several individual statutes providing for the County's contracting authority: 61 Pa.C.S. § 1728; 16 P.S. § 202(4); 61 Pa.C.S. § 1731(a); and 16 P.S. § 1801. (*Id.* at 8–9.)

Plaintiffs respond that none of the statutory citations the York Defendants provided amount to anything more than a delegation of generic contracting powers, which is insufficient to satisfy the clear-articulation test, pursuant to *Edinboro*. (Doc. 47, pp. 13–16.)  In their reply brief, the York Defendants also cite to 16 P.S. § 1802(i), which provides that "the commissioners shall have authority to enter into contracts for equipment and service related to technology and information systems on the basis of best value procurement." (Doc. 52, p. 4.)  The entire language of that statutory provision is relevant for purposes of this analysis:

> Notwithstanding the provisions of this article to the contrary, the commissioners shall have authority to enter into contracts for equipment and services related to technology and information systems on the basis of best value procurement.  Contracts under best value procurement shall be made only after the county has solicited proposals based on performance and outcome specifications developed by the county and describing at minimum the objectives to be met by the system, the tasks to be performed by the system, the users of the system, system security issues, the time frame for system implementation, potential operating technologies, compatibility with existing systems, training and maintenance and shall indicate the process by which the contract shall be awarded.  Best value procurement shall not require a

sealed bid process and shall permit the commissioners to negotiate the terms of the agreement with any responsive and responsible vendor.

16 P.S. § 1802(i).

While the court finds that this statutory provision is a clear articulation of authority to enter into contracts of this nature, it also unequivocally states that the authority is vested in the commissions to enter into such contracts *on the basis of best value procurement. Id.* Thus, on its face, it is not clear that this provision provides a clearly expressed state policy to displace competition, as is required for *Parker* immunity to apply. *See Phoebe Putney*, 568 U.S. at 226. It is simply not apparent that county prisons being authorized to enter into technology and information services contracts "on the basis of best value procurement" is a state policy that will "foreseeably will result in anticompetitive effects." *Town of Hallie*, 471 U.S. at 43. Indeed, it appears that there is a requirement of seeking the "best value procurement" for a county prison entering into such a contract, which suggests that some degree of market competition may be required.

In raising *Parker* immunity as a defense to the antitrust claim against them, the York Defendants carry the burden of proving that when they entered into the YCP-GTL contract, they were acting pursuant to a clearly expressed state policy to displace competition. *See Yeager's Fuel*, 22 F.3d at 1266. Without more explanation of the operation of § 1802 and the meaning of "best value procurement," the court finds that the York Defendants have not satisfied their

burden of establishing a clearly expressed state policy to displace competition. Therefore, the court finds that the York Defendants are not entitled to *Parker* immunity at this stage of this litigation.[5]  This decision is made without prejudice to renewing the assertion that *Parker* immunity applies in the form of a motion for summary judgment on a more developed factual record.

### 4. Eleventh Amendment Immunity

The York Defendants' final argument relating to the antitrust claim is that YCP and Warden Ogle are immune from suit pursuant to the Eleventh Amendment.  (Doc. 36, pp. 11–12.)  The York Defendants further argue that YCP and Warden Ogle lack the capacity to be sued.  (*Id.* at 11.)  Plaintiffs argue that YCP and Warden Ogle have the capacity to be sued by citing the patent litigation and a case in which YCP is a plaintiff.  (Doc. 47, p. 17.)  Plaintiffs further note that they seek only injunctive relief against Warden Ogle, so the claim against him should proceed pursuant to *Ex parte Young*.[6]  (*Id.*)

The Eleventh Amendment to the Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the . . . States . . . ."  U.S. CONST.

---

[5] Because the court concludes that the York Defendants are not entitled to *Parker* immunity at this juncture, it follows that GTL is not entitled to *Parker* immunity because the presence of a clearly expressed state policy to allow the anticompetitive conduct at issue has not been established.

[6] *Ex parte Young*, 209 U.S. 123 (1908).

AMEND. XI.  By its terms, the Eleventh Amendment strictly limits the power of federal courts to entertain cases brought by citizens against the state and state agencies.  "The Eleventh Amendment's protection . . . is not limited to the States alone, but rather extends to entities that function as arms of the State." *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 81 (3d Cir. 2016).  Accordingly, Eleventh Amendment immunity has been extended to county prisons and official capacity suits against county prison officials.  *See Chilcott v. Erie Cnty. Dom. Rels.*, 283 Fed. App'x 8, 10 (3d Cir. 2008) (upholding District Court's dismissal of suit against Erie County Prison and Erie County Domestic Relations Section of the Erie County Court of Common Pleas based on Eleventh Amendment immunity); *see also Horne v. Sabol*, 499 Fed. App'x 140, 142 (3d Cir. 2012) (upholding District Court's dismissal of YCP Warden and York County District Attorney based on Eleventh Amendment immunity); *Fattah v. Sabol*, No. 10-CV-1607, 2012 U.S. Dist. LEXIS 39935, at *11 (M.D. Pa. Mar. 23, 2012) (holding that proposed amendment to complaint would be futile because the Pennsylvania Department of Corrections, York County Prison, and SCI Rockview are entitled to Eleventh Amendment immunity); *Sidorov v. Sabol*, No. 09-CV-2314, 210 U.S. Dist. LEXIS 10217, at *6 (M.D. Pa. Feb. 4, 2010) (holding that York County Prison is a state entity and Plaintiff's claims against its employees in their official capacities are

barred by the Eleventh Amendment).[7]  Consequently, the court concludes that both Warden Ogle and YCP function as arms of the state for purposes of the Eleventh Amendment.

Although claims against state officials in their official capacities are barred by the Eleventh Amendment, under *Ex parte Young*, claims against state officials in their official capacities for prospective injunctive relief are not similarly barred. *See Ex parte Young*, 209 U.S. at 168.  Here, Plaintiffs have sued Warden Ogle in his official capacity, but it is clear that the complaint seeks injunctive relief.  (Doc. 1, p. 47.)

Therefore, YCP is immune from liability in this matter pursuant to the Eleventh Amendment.  Thus, Count 1 is dismissed with prejudice as to YCP. However, Warden Ogle is immune from liability in this matter pursuant to the Eleventh Amendment only to the extent that monetary damages are sought.  Thus, Count 1 is dismissed without prejudice as to Warden Ogle to the extent that the relief requested relief is prospective, injunctive relief.[8]

---

[7] The court notes that to the extent the Eleventh Amendment has been extended to entities such as a county prison, it has also been extended to counties.  *See Vasquez v. Gale*, No. 20-CV-1805, 2022 U.S. Dist. LEXIS 138715, at *24–25 (M.D. Pa. Aug. 4, 2022).  However, because this issue was not raised by the York Defendants in their motion, Plaintiffs have had not an opportunity to address this argument, and the court therefore declines to hold that York County is also immune from liability sua sponte.

[8] The York Defendants agreed, at oral argument, that the Eleventh Amendment would only bar a claim for money damages against Warden Ogle, not a claim for injunctive relief.  (Doc. 94, p. 28.)

### B. Claims for Tortious Interference with Prospective Business Relations and Unfair Competition

Counts 2 and 3 of the complaint raise claims for tortious interference with prospective business relations and unfair competition, respectively. (*See* Doc. 1, ¶¶ 157–167.) The analysis of these two claims overlaps significantly, as they are intertwined. Thus, the court will address them together.

#### 1. Required Elements for Tortious Interference Claim

To state a claim for tortious interference with prospective business relations, a plaintiff must plead the following elements: "(1) a prospective contractual relationship; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *Brokerage Concepts v. United States Healthcare*, 140 F.3d 494, 529–30 (3d Cir. 1998). GTL argues that Plaintiffs failed to adequately plead three of these four required elements. (Doc. 37, pp. 19–24.) There are no arguments specific to the second element, and the court's analysis makes it unnecessary to address the fourth element.

#### i. The First Element–Prospective Contractual Relationship

First, GTL contends that there was no prospective contractual relationship between Plaintiffs and YCP. (*Id.* at 19–20.) A prospective contractual relationship is "something less than a contractual right, something more than a mere hope."

27

*Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994).  A prospective contractual relationship "exists if there is a reasonable probability that a contract will arise from the parties' current dealings."  *Id.*

GTL contends that because Plaintiffs admitted that they knew that Warden Doll did not have the authority to enter into the ICS contract, that Plaintiffs have not established a reasonable probability that a contract would arise from the negotiations.  (Doc. 37, p. 20.)  Plaintiffs, on the other hand, point to the allegations in the complaint detailing months of negotiations, during which Warden Doll asked for and received a draft contract, which was revised at his request, and Plaintiffs were asked to and did prepare a high-level summary for Warden Doll and YCP to present to the York County Commissioners.  (Doc. 51, pp. 22–23.)  Furthermore, Plaintiffs note that Warden Doll's lack of authority to execute the contract matters little where, as here, his duties included selection of certain technology and systems within the facility, including inmate calling systems.  (*Id.* at 23, n.5.)

The court agrees.  The extensive allegations in the complaint certainly demonstrate more than a mere hope on Plaintiffs' part that the contract negotiations would result in an actual contract.  The specific allegations indicating that Warden Doll reviewed the draft contract and requested change that were then made likewise establishes that there was a reasonable probability that a contract

would arise from Plaintiffs' dealing with the York Defendants.  Therefore, the court finds that the complaint adequately pleads a prospective contractual relationship.

### ii.  The Third Element–Absence of Privilege or Justification

Next, GTL asserts that Plaintiffs did not adequately plead the third element. (Doc. 37, pp. 20–23.)  On this, GTL's argument is twofold: first, GTL argues that Plaintiffs have not adequately pleaded absence of privilege; second, GTL argues that Plaintiffs have not adequately pleaded that its conduct was not justified.  (*Id.*)

### a.  Absence of Privilege

In Pennsylvania, a Plaintiff must show, as part of his *prima facie* case, that the defendant's conduct was not justified or privileged.  *Acumed LLC v. Advanced Surg. Servs.*, 561 F.3d 199, 214 (3d Cir. 2009) (citing *Silver v. Mendel*, 594 F.2d 598, 602 n.6 (3d Cir. 1990)).  As to privilege for a defendant's conduct, "Pennsylvania has adopted section 768 of the Restatement (Second) of Torts, which recognizes that competitors, in certain circumstances, are privileged in the course of competition to interfere with others' prospective contractual relationships."  *Acumed*, 561 F.3d at 215 (citing *Gilbert v. Otterson*, 550 A.2d 550, 554 (Pa. Super. Ct. 1998).  This is because two parties seeking to sell similar products to prospective purchasers are necessarily interfering with the other's attempts to do the same.  *Acumed*, 561 F.3d at 215.  Thus, under the Restatement:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if: (a) the relation concerns a matter involved in the competition between the actor and the other; (b) the actor does not employ wrongful means; (c) his action does not create or continue an unlawful restraint of trade; and (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768.

Courts relying on comment e to § 768 have interpreted the "wrongful means" element to require that a plaintiff, to be successful in a tortious interference action, demonstrate that a defendant engaged in conduct that was actionable on a basis independent of the tortious interference claim.  *See Acumed*, 561 F.3d at 215; *see also Brokerage Concepts v. United States Healthcare*, 140 F.3d 494, 531 (3d Cir. 1998).  Moreover, the Third Circuit noted that even though the Pennsylvania courts have not interpreted the "wrongful means" element, it is likely that the Pennsylvania Supreme Court would adopt this meaning.  *Acumed*, 561 F.3d at 215–16.  Indeed, both parties agree that the appropriate interpretation of this element of the business competitor's privilege requires that the conduct must be independently actionable.  (Doc. 51, p. 24; Doc. 37, pp. 20–21.)

Here, GTL argues that no independently actionable conduct was alleged in the complaint, as GTL's alleged statements do not amount to fraud because they are statements of prediction and opinion and the allegations do not satisfy the heightened pleading standard for fraudulent allegations.  (Doc. 37, p. 21.)

30

Plaintiffs respond by asserting that the conduct is independently actionable on two separate bases: defamation and unfair competition.  (Doc. 51, pp. 24–26.)  The court will analyze the two allegedly independently actionable claims separately.

### i.  Defamation

As to defamation, Plaintiffs contend that the statements were "published" to York County officials; they applied to Plaintiffs; the recipients understood their defamatory meaning and applicability to Plaintiffs; the statements financially harmed Plaintiffs by causing it to lose a contract with the County; and no privilege applied.  (*Id.* at 26–27).  In a footnote, Plaintiffs assert that alternatively, GTL's statements are independently actionable as commercial disparagement because the statements were false; GTL intended for their publication to cause Plaintiffs pecuniary loss; pecuniary loss in fact resulted; and GTL knew the statements were false.  (*Id.* at 27, n.6.)[9]

In their reply Brief, GTL first notes that Plaintiffs have not raised a claim of defamation in the complaint, but notwithstanding that problem, Plaintiffs' factual allegations do not establish a *prima facie* case of defamation.  (Doc. 53, pp. 9–10.)  GTL maintains that the face of the complaint contains merely conclusory

---

[9] The court will discuss this argument in terms of a defamation claim, as the legal standard applicable to a defamation claim is identical to that for commercial disparagement.  *Diodato v. Wells Fargo Ins. Servs., USA*, 44 F. Supp. 3d 541, 561 n.14 (M.D. Pa. 2014).

allegations and that the statements allegedly made by GTL made were opinion, not fact, and therefore cannot form the basis of a defamation claim.  (*Id.*)

It is unclear whether a plaintiff is required to actually plead a separate cause of action in order to find an independently actionable basis to sustain a tortious inference with contractual business relations claim.  However, the court agrees that the allegations in the complaint relating to the allegedly defamatory nature of GTL's remarks are conclusory, using phrases such as "false claims and misrepresentations," "knowingly false and defaming," and "false and detrimental." (*See* Doc. 1, ¶¶ 67–78.)  The complaint lacks factual allegations that would allow the court to make reasonable inferences that Plaintiffs have adequately pleaded the required elements of defamation.  Because Plaintiffs have not adequately pleaded facts sufficient to state a claim for defamation, the court need not engage in the fact-intensive inquiry to determine whether the statements were statements of fact or opinion.

### ii.  Unfair Competition

The second alleged independent tortious conduct is unfair competition, which is pleaded at Count 3 in the complaint.  Accordingly, the court will turn to an analysis of Count 3.  In this section, the court will assess whether this independent tort count can support the tortious interference claim, and in a later

section, the court will assess whether this count will otherwise survive GTL's

12(b)(6) challenge.

Traditionally, unfair competition has been defined in Pennsylvania as

passing off a rival's goods as one's own, thus creating confusion as to the

authenticity of the goods in question. *Scanvec Amiable Ltd. v. Chang*, 80 Fed.

App'x 171, 180 (3d Cir. 2003.)  This definition simply does not apply to the facts

of this case.  However, a growing number of trial courts in Pennsylvania have

begun expanding the definition of unfair competition to comport with the

definition set forth in the Restatement.  *See Bldg. Mat'ls Corp. of Am. v. Rotter*,

535 F. Supp. 2d 518, 526 n. 4 (E.D. Pa. 2008) (collecting cases).  Under the

Restatement (Third):

> One who causes harm to the commercial relations of another by
> engaging in a business or trade is not subject to liability to the other for
> such harm unless. . . the harm results from . . . other acts or practices of
> the actor determined to be actionable as an unfair method of
> competition, taking into account the nature of the conduct and its likely
> effect on the person seeking relief and the public.

Restatement (Third) of Unfair Competition § 1 (1995).  Comment g to the

Restatement provides that "[a]s a general matter, if the means of competition are

otherwise tortious with respect to the injured party, they will also ordinarily

constitute an unfair method of competition."  *Bldg. Mat'ls*, 535 F. Supp at 526 n.4

(quoting Restatement (Third) of Unfair Competition § 1, cmt. g (1995)).  Thus,

tortious interference may form the basis of a claim for unfair competition.  *Id.*;

*Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp 2d. 622, 688 (E.D. Pa. 2003).

Plaintiffs' brief in opposition sets forth arguments to expand the definition of unfair competition beyond the previously-accepted definition relating to passing off the goods of another, but does not specifically argue that the Restatement language applies to the facts of this case or identify what the underlying "other acts or practices of the actor determined to be actionable as an unfair method of competition" are in the instant case. (*See* Doc. 51, pp. 28–29.) However, viewing the complaint in the light most favorable to Plaintiffs, it is clear that the conduct underlying the unfair competition claim is almost identical to the conduct underlying the tortious interference claim. In fact, there are very few differences between the allegations set forth in Counts 2 and 3 in the complaint. (*Compare* Doc. 1, ¶¶ 157–162 *with* ¶¶ 162–167.) Moreover, the complaint states that "[t]he same tortious conduct described in Count II above also constitutes unfair competition." (*Id.* ¶ 164.) Thus, the unfair competition claim is premised on the allegation of tortious interference with prospective contractual relations, while the tortious interference with prospective contractual relations claim is premised on the underlying allegation of unfair competition, with both claims requiring independent actionable conduct. The cross-referencing of these counts presents a quandary for the court, presenting a potentially endless loop of circular logic

reminiscent of Wallace Shawn's famous monologue analyzing how to determine the poisoned goblet in the 1987 film, "Princess Bride."

Given the significant overlap of the factual bases for these claims, the court finds that under these circumstances, the unfair competition claim is duplicative of the tortious interference claim.  One cannot go forward without the other. Therefore, Plaintiffs have necessarily failed to set out independently actionable conduct for purposes of their tortious interference claim, as the only potentially actionable conduct is not, in fact, independent from the tortious interference claim. As discussed in more detail in section 2 below, Plaintiffs have not sufficiently plead a claim for unfair competition in any event.

### b.  Absence of Justification

The alternative argument GTL presents as to the third element of the tortious interference claim is that GTL's conduct was justified.  (Doc. 37, pp. 22–23.)  GTL asserts that it had a legitimate interest in protecting its existing contractual relationship with York County and YCP.  (*Id.*)  On this point, Plaintiffs provide no rejoinder.

To determine whether a defendant was justified in the context of a tortious interference claim, the issue turns on whether a defendant's conduct was "improper."  *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978).

In determining whether an actor's conduct is "proper," Pennsylvania courts are guided by the following factors derived from the Restatement (Second) of Torts § 767 (1979):

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Windsor Secur., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir. 1993.) Furthermore, when conducting this analysis, the Third Circuit has repeatedly held that substantial deference is afforded to "defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern." *See id.* at 665.

Again, the factual background that led to the filing of this lawsuit is relevant for purposes of this analysis.  GTL and its predecessors have had the ICS contract at YCP since 2003.  (Doc. 1, ¶ 22.)  GTL's then-current ICS contract was set to expire in December 2020.  (*Id.* ¶ 36.)  During the pendency of the unrelated patent litigation, Plaintiffs learned of this fact and the terms of the contract during the first day of settlement negotiations in the patent case.  (*Id.*)  Plaintiffs then expended

36

significant effort over the ensuing months to negotiate an ICS contract for YCP.

(*Id.* ¶¶ 36–60, 72–78.)  It is therefore irrefutable that GTL had a legitimate business

concern and acted to protect that legitimate business concern.  Accordingly, the

court concludes that GTL's conduct was justified.  Therefore, under both the

business competitor's privilege and the test set forth in § 767 of the Restatement

(Second) of Torts, Plaintiffs have failed to adequately plead the third element of

the tortious inference claim and Count 2 will be dismissed.

## 2.  Required Elements for Unfair Competition

As to Plaintiffs' unfair competition claim, the court notes that Plaintiffs have

failed to provide any case law, binding or otherwise, providing for a cause of

action for unfair competition under the circumstances present here.  The cases to

which Plaintiffs cite arise in starkly different factual contexts.  *See Granite States*

*Ins. Co.*, 57 F.3d 316 (3d Cir. 1995) (analyzing the definition of the common law

tort of unfair competition in the context of an "unfair competition" category of

injury within an insurance policy); *see also Bldg. Mat'ls Corp. of Am. v. Rotter*,

535 F. Supp. 2d 518 (E.D. Pa. 2008) (court denied motion to dismiss unfair

competition claim without prejudice, noting that several judges in the Eastern

District of Pennsylvania have applied the Restatement definition of unfair

competition, but that no appellate court in Pennsylvania had done so); *Carl A.*

*Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469 (Pa. 1964) (holding that

making false or misleading statements about the circumstances under which an employee left an employer constitutes unfair competition); *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Servs., Inc.*, No. 1994-2166, 1995 WL 842000 (Pa. Com. Pl. Oct. 18, 1995) (court applying the Restatement definition of unfair competition and denying preliminary objections where the face of the complaint contained averments of and a count of defamation).

Therefore, even assuming that the broader definition of unfair competition from the Restatement applies, Plaintiffs have failed to state a claim. Count 3 will likewise be dismissed. Counts 2 and 3 will be dismissed without prejudice to the extent that they are re-plead containing a valid independent, actionable basis under each count.

### C. Maintenance[10]

In the context of Plaintiffs' motion for preliminary injunction, the court has previously addressed the viability of the maintenance claim. For the sake of clarity, the court will reiterate the relevant portions of that analysis here.

At the outset, the court notes that there is a dispute between the parties as to whether maintenance exists as an affirmative cause of action under Pennsylvania law. (Doc. 37, pp. 26–27; Doc. 51, p. 31; Doc. 53, pp. 14–15.) GTL argues that

---

[10] Plaintiffs concede that they have not stated a claim for champerty. (Doc. 51, p. 50.) As a result, the court only refers to Plaintiffs' maintenance claim.

Plaintiffs did not cite any cases in which Pennsylvania courts recognized maintenance as a cause of action.  (Doc. 53, pp. 14–15.)

Upon careful review of this threshold issue, the court disagrees with GTL. In one of the cases cited in Plaintiffs' brief in support, the Commonwealth Court affirmed the trial court's order granting summary judgment on the champerty and maintenance claim.  *Westmoreland Cnty. v. Rta Grp.*, 767 A.2d 1144, 1148 (Pa. Commw. Ct. 2001).  Champerty and maintenance are generally plead together, as champerty is a specific type of maintenance.  *Allied Med. Assocs. v. State Farm Mut. Auto. Ins. Co.*, No. 08-02434, 2008 U.S. Dist. LEXIS 101659, at *9 n.7 (E.D. Pa. Oct. 30, 2008).  Thus, while Plaintiffs concede they have not adequately pleaded a claim for champerty, the Commonwealth Court's holding in *Rta Grp.* affirming summary judgment on an affirmatively plead champerty claim—which is a specific type of maintenance claim—persuades the court that Pennsylvania courts recognize maintenance as an affirmative cause of action.

Furthermore, while there is some support for GTL's argument that champerty and maintenance are outdated and have been subsumed by other tort claims, namely tortious interference with business relationships, not all Pennsylvania courts take this view.  *See WFIC, LLC v. Labarre*, 148 A.3d 812, 818 (Pa. Super. 2016) (court sua sponte finding agreement to be champertous). Therefore, for purposes of the instant motion, the court finds that there is sufficient

evidence that maintenance exists as an affirmative cause of action under Pennsylvania law to proceed with the analysis of whether Plaintiffs have adequately stated a claim upon which relief can be granted.

Maintenance is defined as "[a]n officious intermeddling in a lawsuit by a non-party by maintaining, supporting, or assisting either party, with money or otherwise, to prosecute or defend the litigation." *Clark v. Cambria Cnty. Bd. of Assessment Appeals*, 747 A.2d 1242, 1244 n.4 (Pa. Commw. Ct. 2000). "Officious intermeddling" is defined as "meddling with the affairs of others where such involvement is neither asked nor needed." *Allied Med. Assocs.*, 2008 U.S. Dist. LEXIS 101659 at *31. Additionally, a plaintiff must allege "malicious, dangerous, or illegal intermeddling with other parties' litigation" to support a claim of maintenance. *Gould v. Brock*, 69 A. 1122, 1122 (Pa. 1908).

GTL argues that Plaintiffs did not allege that GTL's participation in the patent lawsuit was "malicious, dangerous, or illegal," nor have they asserted that GTL either volunteered to participate in the patent suit or that GTL's involvement was not "asked for." (Doc. 53, p. 15.) In contrast, Plaintiffs assert that an examination of the YCP-GTL contract clearly demonstrates that GTL is illegally maintaining the defense of the patent lawsuit on behalf of the York Defendants. Plaintiffs point to the fact that GTL is not a party to the patent lawsuit and has no legitimate interest in the litigation, which concerns mail service provided by a

different vendor, yet GTL entered into an agreement to fund and direct the York Defendants' defense.  (Doc. 51, pp. 30–31.)

It was at this point in the preliminary injunction analysis that the court, for the first time, noted that it could not ignore the contextual backdrop in this case in order to analyze the legal issue presented: Plaintiffs initiated the patent lawsuit against the York Defendants and subsequently leveraged settlement negotiations in that lawsuit in order to negotiate an ICS contract with YCP.  It is clear from the face of the complaint in this lawsuit that during the settlement negotiations in the patent litigation, Plaintiffs and YCP did little more than discuss the proposed ICS contract between Plaintiffs and YCP.  (*See* Doc. 1, ¶¶ 36–71, 75, 78.)  It was this conversion from settlement negotiations in the patent case to a business pitch to provide ICS for YCP that piqued the interest of YCP's ICS provider at the time— GTL.

Therefore, to the extent that GTL is alleged to have "meddled" in the patent lawsuit, the court cannot overlook the fact that Plaintiffs were courting YCP's ICS business through the patent lawsuit negotiations, effectively baiting GTL into forming an interest in the patent litigation where GTL otherwise would not have any interest.  It should come as no surprise to Plaintiffs that GTL, who was then engaged in a long-standing business relationship with YCP for the provision of ICS, sought to protect its business relationship.

Against this contextual backdrop, the court previously noted that it was unclear whether GTL in fact had a "legitimate interest" in the patent lawsuit. Having considered these arguments once again, and examining the face of the complaint, the court concludes that Plaintiffs have not sufficiently alleged that GTL was an "officious intermeddler." The complaint sufficiently alleges "meddling" based on the averment that "GTL lacks an independent legal or equitable interest in the Patent Litigation between Smart Communications and the York Defendants." (Doc. 1, ¶ 169.) However, the complaint does not allege that GTL's "meddling" in the patent lawsuit was "neither asked nor needed." Indeed, the factual context makes clear that there was a business reason for YCP to ask for or need financial assistance from GTL in defense of Plaintiff's patent litigation against YCP. In light of this context, it is not reasonable to infer from the factual allegation of "meddling" that GTL's "meddling" was unsolicited or unwelcomed by YCP. Additionally, the complaint does not allege that GTL's defense of YCP in the patent lawsuit was "malicious, dangerous, or illegal," which allegation is required to state a claim for maintenance. Therefore, GTL's motion to dismiss will be granted as to Count 4.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss will be granted.

(Docs. 28, 29.)  An appropriate order follows.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: November 1, 2022